**LOUISIANA WILDLIFE FEDERATION, INC., Rapides Wildlife Assn., Environmental Defense Fund, Inc., National Wildlife Federation, Orleans Audubon Society (J.M. Graves and Graves, Inc., Intervenors)**

v.

**Colonel Dennis J. YORK, John O. Marsh, Jr., Tensas Delta Land Company, Harold Patten, Dennis Boyte, A.L. Evans, J.D. Alexander, Westbank Planting Company, U.S. Environmental Protection Agency and U.S. Department of the Interior.**

Civ. A. No. 83–1885.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Sept. 20, 1984.

James T.B. Tripp, New York City, Michael Osborne, New Orleans, La., for plaintiffs.

Ledoux R. Provosty, Jr., Alexandria, La., for intervenors J.M. Graves & Graves, Inc.

Cook, Yancey, King & Galloway, Sidney E. Cook, Shreveport, La., for Tensas Delta Land Co., Dennis Boyte, Harold A. Patten and A.L. Evans.

Charles A. Collins, Vice-President, Westbank Planting Co., Greenville, Miss., Milling, Benson, Woodward, Hillyer, Pierson & Miller, Joseph E. LeBlanc, Jr. and M. Taylor Darden, New Orleans, La., for Westbank Planting Co.

Henry H. Black, Asst. Dist. Counsel, U.S. Army Corps of Engineers, Vicksburg, Miss., Lawrence Moon, Asst. U.S. Atty., Lafayette, La., James M. Spears and Elizabeth Stein, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., F. Henry Habicht, II, Asst. Atty. Gen., Land

and Natural Resources Div., Hubert M. Crean, Sp. Litigation Counsel, U.S. Dept. of Justice, Washington, D.C., for federal defendants.

EDWIN F. HUNTER, Jr., Senior District Judge.

In this action, plaintiffs challenge the adequacy of federal defendants' environmental review of six permit applications to clear and convert to agriculture some 5,000 acres of bottomland hardwood wetlands and the Sicily Island Levee Project, a federally funded agricultural flood protection project. The action is brought under the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4332(2)(C), Section 404 of the Clean Water Act, 33 U.S.C. Section 1344, the Fish and Wildlife Coordination Act, 16 U.S.C. Section 661 et seq., the Administrative Procedure Act, 5 U.S.C. Sections 701–706, Section 309 of the Clean Air Act, 42 U.S.C. Section 7609 and applicable regulations.

The Sicily Island Levee project, for which Army defendants prepared a draft and final Environmental Impact Statement (FEIS) dated September, 1981, is designed to abate backwater flooding from the Black, Ouachita, Red and Mississippi Rivers in a 75,000 acre area in East Catahoula Parish. According to the FEIS, of the 75,000 acres, bottomland hardwoods make up some 21,100 acres. Of these 21,100, 3,955 are found in four of the permit tracts.

Plaintiffs filed their challenges to the clearing permits and the Sicily Island Levee Project on August 3, 1983; Judge Scott issued a temporary order restraining the clearing of the six privately owned tracts.[1] Following the September 1983 decision of the Fifth Circuit in *Avoyelles Sportsmen's League v. Marsh* (Avoyelles III), 715 F.2d 897 (5th Cir.1983), the parties stipulated that the records be remanded to the Corps for further evaluation in light of that decision.

On or about May 21, 1984, the Corps published revised Environmental Assessments, Findings of No Significant Impact, Findings of Fact and Section 404(b)(1) Evaluation Reports. Simultaneously, the Corps announced that it was lifting the suspensions on each of the six permits.

On June 12, 1984, plaintiff Environmental Defense Fund, Inc., mailed notice to William D. Ruskelshaus, Administrator of the Environmental Protection Agency (EPA), of its intention to file suit under Section 304 of the Clean Air Act and Section 505 of the Clean Water Act for his alleged failure to perform nondiscretionary duties under those Acts in connection with the six permits and accompanying environmental assessments as well. Plaintiffs also alleged that the EPA had failed to perform its duty under the Clean Water Act (CWA) to uphold the geographic and activities jurisdiction of the Section 404 program with respect to the challenged permits.

## DESCRIPTION OF TRACTS AND SICILY ISLAND LEVEE PROJECT

In order to convey a basic understanding of the location and activities concerning the six privately owned tracts and the Sicily Island Project, a discussion of the facts will be divided into a consideration of three basic areas: (1) the Sicily Island Levee Project; (2) those privately owned tracts located within the perimeters of the SILP area (Tensas, Patten, Boyle and Evans tracts); and (3) those privately owned tracts situated outside the SILP area (Westbank and Alexander tracts).

*Sicily Island Area Levee Project*

The Sicily Island Area Levee Project consists of over 75,000 acres of land located in northern Catahoula Parish and the southeast corner of Franklin Parish. It is bounded on the west by the Ouachita River, on the south by the Tensas River, on the east by the Tensas River and Bayou

---

**1.** A "permit" is not required for the Sicily Island Levee Project, as the Corps of Engineers is not required to issue a permit to itself. A permit is required, however, for clearing by private landowners.

Macon, and on the north by high ground.[2] The project is designed, among other things, to obstruct the natural backwater flooding regime which now exists by construction of backwater levees, drainage channels, drainage structures and pumps, and thus to reduce the frequency and duration of backwater flooding of some 75,000 acres in Catahoula Parish. Included in this protected area are 3,910 acres of wetlands which are the subject of the Tensas, Patten, Boyle and Evans permits. The Corps of Engineers lists as objectives of the project the reduction of flood damage to buildings in the area and the more efficient utilization of agricultural lands.[3]

While many long-term beneficial effects will stem from the project, the Corps candidly admits that the project will result in some adverse environmental effects.[4] Construction of the proposed project will further reduce forest, fish, and wildlife resources in the project area. Construction of the project will result in a total loss of 428 acres of bottom-land hardwood forest, including about 37 acres of forested wetlands. The project will reduce winter flooding on lands that are utilized by resident and migratory waterfowl about 84 percent. Natural spawning and nursery areas that are utilized by a variety of species of fish will be reduced by the project.[5]

In mitigation of the environmental effects, the Corps made two proposals. First, the Corps recommended the purchase and development of 3,000 acres of bottom land forest to compensate fully for project-induced wildlife habitat losses. Subsequent to this recommendation, the United States Congress passed Public Law 96–285 to establish the Tensas National Wildlife Refuge.[6] To date over 30,000 acres of land in the Tensas River Basin have been acquired as mitigation for, inter alia, the Sici-

ly Island Project at a cost in excess of $50 million. Secondly, to compensate for all fishery losses, the Corps prepared the construction of water supply facilities, including the installation of gated water control structures in the dam near the confluence of the Ouachita River and Bayou Louis, thereby simulating the historical hydrolegic regime of the fishing areas.[7]

*Tensas, Patten, Boyce and Evans Tracts*

The Tensas Delta tract consists of 2,800 acres of wetlands located in Catahoula Parish. The tract is bounded on the east and south by Black Bayou and Bayou Louis and on the north and west by the hill line of the Sicily Island land form. The tract naturally draws into Black Bayou and Hawthorne Bayou.[8] Of the 2,800 acres of the tract, Tensas Delta Land Company proposes to clear approximately 2,460 of the more elevated acres. The purpose of the clearing is to convert the area from cutover woodlands to agricultural production.

The area is subject to frequent flooding caused by backwater from the Mississippi and Red Rivers and headwater floods from the Ouachita and Tensas Rivers, as well as from intense rainfall within the drainage basin itself.[9] Under existing conditions, the one year flood elevation is approximately 45.5 feet N.G.V.D., and at that elevation, approximately 440 acres of the tract would be inundated. The permit holder plans to clear only areas above 46 feet N.G.V.D. that are flooded once every two to four years under existing conditions. Woodlands below elevation 46 feet N.G.V.D. will remain for wildlife and fisheries' use and to provide vegetative buffer zones along the streams which border the property and the natural drains which traverse the property. The applicant also proposes to set aside 120 acres of adjoining forested lands near the

2. See SIALP GMD plate 20; see also GDM p. 2.

3. General Design Memorandum p. 3.

4. Sicily Island Final Environmental Impact Statement p. 7.

5. Ibid.

6. Final Environmental Impact Statement p. 12.

7. Final EIS pp. 9, 10.

8. REA Tensas plate 17.

9. REA of Tensas, p. 2. See also Plate 17 from SILP, GDM.

north boundary for wildlife and fisheries' use.[10]

The Patten, Boyle and Evans permit applications sought permission to clear 391 acres,[11] 366 acres,[12] and 398 acres,[13] respectively, of wetlands for agricultural use. These tracts are in the vicinity of the Tensas Delta tract, and elevations range from a high of 50 to 55 feet N.G.V.D. on each tract to a low of less than 45 feet N.G.V.D. The one year flood frequency elevation is 45.5 feet N.G.V.D.[14]

The permits did not issue as applied for; instead, restrictive conditions were imposed by the Corps upon each permit. The permits (1) forbid land clearing below elevation 46 feet N.G.V.D. (i.e., at a base level higher than the one year flood frequency elevation of 45.5); (2) require the maintenance of uncleared buffer zones at least 150 feet wide on each side of each water traversing the tracts; (3) require turnrows to be seeded and maintained in Bermuda, rye, or a suitable grass to aid in filtration of sediments; and (4) require the application of Best Management Practices required by the Louisiana Department of Natural Resources as a condition for Water Quality Certification.[15]

The REAs for the Patten, Boyle and Evans tracts demonstrate that (as in the case of the Tensas Delta tract) on each tract those wetlands most closely coupled with, and of the greatest service to, the surrounding aquatic environment will be preserved. This preserved acreage will provide habitat for terrestrial and aquatic species, while conversion of the balance of the tracts to agricultural production is expected actually to enhance the habitat of waterfowl and small animals in the area.[16] Finally, implementation of the required Best Management Practices of the State of Louisiana Department of Natural Resources (including minimum tillage, grassed roadways and waterways, crop rotation, and vegetated buffer zones) will minimize any degradation of water quality which might otherwise result from uncontrolled erosion transporting sediment and agrichemical runoff.[17]

Following issuance of the § 404 permits, Tensas Delta Land Company, as owner of the four tracts, entered into contracts with Graves, Inc. in March and April, 1983, to prepare the land for farming. The contract obligate Tensas Delta to spend over one-half million dollars to prepare the land in accordance with the permits. Actual clearing activities began about July 1, 1983 and were well under way by the time of the issuance of the temporary restraining order on August 3, 1983.

*Westbank and Alexander Tracts*

Both the Westbank and the Alexander tracts are situated outside the SILP area. The Westbank tract is located in East Carroll Parish in the northern part of Louisiana more than 100 miles from the other permit areas. The permit issued authorizes the clearing of 1,559 acres of the 1,672 acre Westbank tract for cultivation in a rice-sou bean crop rotation and directed that 113 acres be preserved in their forested state. (Prior to the issuance of the TRO, 132 acres had been cleared). The Corps determined that these areas are more closely coupled with the waterbodies on the tract. Their preservation will protect the significant wetland functions of the tract.

The hydrology and elevation of the Westbank tract differs significantly from those of the other tracts. Elevations on the Westbank property range from 70 feet up to 90 feet. It is only the higher elevations of 85 to 90 feet that are to be cleared under the Corps' permit. Backwater flooding

10. Tensas REA p. 4.

11. Patten REA p. 3.

12. Boyle REA p. 3.

13. Evans REA p. 3.

14. Patten, Boyle, Evans REAs p. 2.

15. Administrative Records, pp. D7–D8.

16. Patten, Boyle, and Evans REAs, pp. 8–9.

17. Patten, Boyle and Evans REAs, p. 10.

would be expected only once every seven to 100 years at the elevations to be cleared.[18] The only significant source of water that supports wetland vegetation in the Westbank tract is derived from ponded rainfall.

The area covered by the permit is part of a larger tract known as Westbank's "Elgin Tract," which totals 9,838 acres. The Corps found that the northern acreage of the Elgin tract not subject to the permit could support increased annual population due to migration of displaced wildlife. Five hundred acres of the northern portion of the Elgin tract have been dedicated for preservation as a greentree reservoir for waterfowl.[19] As stated earlier, 113 acres within the Westbank permit area will be left undisturbed as wildlife habitat. To protect the water quality, buffer areas and grassy waterways will be provided and a one hundred foot strip of vegetation will be left on each side of the main stream.[20]

The Alexander tract consists of 420 acres of wetlands located outside the SILP area in Catahoula Parish. The state of this property is similar to that of the Westbank tract. The tract consists of two distinct and separate areas in terms of soils, hydrology, vegetation and topography. The higher area, those lands above the 50-foot contour (50 ft. N.G.V.D.) contains approximately 325 acres. Due to the construction of a local interest levee in 1974–1975, the higher area is not subject to backwater flooding but once in every ten years.[21] Due to the low inundation frequency, the highlands do not serve as a prime terrestrial wildlife habitat. Since there is no riverine overflow, these lands do not contribute substantially to the transport of nutrients and detritus and rarely serve as breeding and spawning grounds.[22] The lower area of 95 acres is basically a basin or sump area with an outlet eventually flowing into the Ouachita River. This area is more densely populated with bald cypress, swamp privet, bitter pecan, and overcup oak. These lower acres will remain uncleared for wildlife uses and water quality maintenance.[23]

## ENVIRONMENTAL IMPACT STATEMENT

The plaintiffs' first request for relief prays to this court to enjoin the clearing and conversion for agricultural use by the private defendants the six previously described tracts of bottom-land hardwood in Catahoula and East Carroll Parishes and to direct the Corps of Engineers to revoke the six challenged permits. According to the plaintiffs' brief, the clearing should be stopped and the permits revoked as a result of the Corps' alleged failure to comply with, inter alia, Section 404 of the Clean Water Act, 33 U.S.C. § 1344. The gravamen of their complaint is that the clearing of the six permitted tracts will significantly affect the quality of the human environment, and therefore, an environmental impact statement must be prepared. Plaintiffs seek to enjoin the clearing of the tracts until such time as an environmental impact statement is prepared.

The National Environmental Policy Act (NEPA) in 42 U.S.C. § 4332(2)(c) requires federal agencies to prepare a detailed statement whenever they propose major federal action significantly affecting the quality of the human environment. In order to determine whether or not a proposed federal action significantly affects the quality of the human environment, an agency must make an environmental assessment (EA) of the proposed action. If, as a result of that analysis, the agency determines that the

---

18. This stage data is found in the Westbank Revised Environmental Assessment as "H7" after p. 2. It indicates that backwater flooding would be expected at an elevation of 85' only once every 7 years; at an elevation of 86' only once every 13 years; at 88' only once every 70 years; at 89' only once every 90 years; and at 90' only once every 100 years.

19. Westbank REA p. 8.

20. Westbank REA p. 10.

21. Alexander REA p. 2.

22. Alexander REA p. 10.

23. Alexander REA p. 4.

proposed action will not significantly affect the quality of the human environment, a Finding of No Significant Impact (FONSI) is issued. If, on the other hand, the agency finds to the contrary, it must prepare an environmental impact statement (EIS) in order to document the agency's consideration of the environmental consequences of its actions.

■ The Corps' determination of an environmental impact as "significant" or "nonsignificant" is reviewed under a standard of "reasonableness." This standard of review was stated in *Sierra Club v. Hassell,* 636 F.2d 1095 (5th Cir.1981);

> These agency determinations are tested in Court under a "reasonableness" standard. A reviewing court is to review the administrative records as well as other evidence to determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary. If the agencies engaged in this analysis and reasonably concluded on the basis of their findings that an impact statement was not required, their determinations will be upheld.

Other Fifth Circuit pronouncements of this standard are included in the following cases: *Vieux Carré Properties Owners v. Pierce,* 719 F.2d 1272 (1983); *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634 (1983); *Save the Bay, Inc. v. United States Corps of Engineers,* 610 F.2d 322 (1980), cert. denied; and *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (1973).

The Revised Environmental Assessments concerning the Tensas Delta, Boyle, Evans, Patten, Westbank, and Alexander tracts demonstrate that the Corps engaged in precisely the type analysis required by the Fifth Circuit and NEPA. The Corps considered the loss of wildlife habitat, the potential loss of fisheries, and possible degradation of water quality. (See Tensas Delta REA pp. 19, 20; Boyle REA pp. 18, 19; Evans REA pp. 18, 19; Patten REA pp. 18, 19; Westbank REA pp. 26, 27; and Alexan-

der REA pp. 17, 18). Also, in each instance, steps were taken to mitigate the effects of the clearing by issuing only restricted permits requiring preservation of certain acreage and, in some instances, dedication of other acreage to preservation and/or implementation of agricultural management practices designed to protect the environment.

■ The plaintiffs argue that the environmental impact caused by the clearing of the six tracts is significant, per se, due to the relative size of the tracts and their classification as wetlands. In *Lower Alloways Creek Township v. Public Service Electric & Gas Co.,* 687 F.2d 732 (3rd Cir. 1982), plaintiffs made a similar argument that something inherent in the nature of nuclear waste storage in "sensitive coastal wetlands" entailed a significant impact on the human environment, thereby requiring an EIS. The court first held that the record did not support the allegation that the site was particularly "sensitive." The court continued, noting the problem with such an argument:

> Moreover, it is an open question whether that fact alone, assuming its truth, would be sufficient to trigger the EIS requirement: after all, were a court to adopt the Township's line of reasoning concerning the "sensitiveness" of the coastal region *absolutely no action* ever could be taken at Salem I without an EIS being prepared.

This court refuses to accept plaintiffs' contention that the impact of an activity is intrisically significant, and therefore requires an EIS, whenever the area for which a permit is requested consists of a relatively large tract of land.

In granting the six permits in this case, the Corps found that not all wetlands are equally valuable. According to Dr. James Gosselink, one of the experts called to testify by the plaintiffs, wetlands' environmental functions diminish as they become farther removed from adjacent riverine sys-

tems.[24] Dr. Gosselink has found that the significance of the functions served by forested wetlands depends upon their location on the flooding gradient. The "peak" functions occur at the one to one and a half year flooding frequency, and the significance of the functions diminishes as flooding becomes more infrequent. In each of the six permits, the restrictions placed by the Corps will preserve those areas performing "peak" wetland functions. As for the lands to be cleared, the Corps found that their conversion to agricultural use, when considered individually or cumulatively, would not cause significant environmental impacts. While the plaintiffs and their experts might disagree with the Corps' determination, such an academic disagreement with the Corps' application of the judgment entrusted to it by Congress under the Clean Water Act does not serve as a proper basis for its argument that the Corps' conclusion was unreasonable. Rather, the document, in discussing the conclusions reached by a special coalition of Corps' specialists reviewing Westbank Permit issues, notes:

> As review progressed, the magnitude of environmental impacts associated with the Project narrowed to loss of wildlife habitat. Although this loss is substantial (see cumulative impact conclusion below), *a decision on this permit application by itself cannot be considered a major Federal action having significant impact on the human environment.*
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Certainly, bottomland hardwood losses and the environmental consequences of these losses can only be considered substantial \* \* \*.
> (Plaintiffs' Exhibit 51, November 9, 1982, entitled Disposition Form," at 5 (emphasis added)).

The fact that the document used the word "substantial" and not "significant" was acknowledged by plaintiffs' counsel during argument. (Transcript at 67, lines 8, 20–22.)

**24.** See Westbank REA, pp. 18–19, 25–26.

## ISSUANCE OF THE PERMITS

The remainder of the plaintiffs' arguments relating to the six tracts concern the Corps' decision to issue the clearing permits for the tracts. Namely, the permits to clear the six tracts should not issue since the activity associated with the clearing, i.e., soy bean production, is not "water dependent," and therefore, practicable alternatives that do not involve special aquatic sites are presumed to be available. Before entering into a consideration of the merits of this argument, a discussion of the applicable standard of judicial review will be presented.

In the recent United States Supreme Court decision in *Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), Justice O'Connor, speaking for all of the Court considering the case, discussed the design of the National Environmental Policy Act and announced the standard of review to be used in evaluating the agency's determination:

> We are acutely aware that the extent to which this Nation should rely on nuclear power as a source of energy is an important and sensitive issue ... Resolution of these fundamental policy questions lies, however, with Congress and the agencies to which Congress has delegated authority, as well as with state legislatures and, ultimately, the populace as a whole. Congress has assigned the courts only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes. As we emphasized in our earlier encounter with these very proceedings, "[a]dministrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute ..., not simply because the Court is unhappy with the result reached." *Vermont Yankee [Nuclear Power Corp. v. Natural Resources De-*

*fense Council,],* 435 U.S., [519] at 558 [98 S.Ct. 1197, 1219, 55 L.Ed.2d 460].

The controlling statute at issue here is the National Environmental Policy Act. NEPA has twin aims. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee, supra,* at 553 [98 S.Ct. at 1216]. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. *Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139, 143 [102 S.Ct. 197, 201, 70 L.Ed.2d 298] (1981). Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations. See *Stryckers' Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227 [100 S.Ct. 497, 499, 62 L.Ed.2d 433] (1980) (per curiam). Rather, it required only that the agency take a "hard look" at the environmental consequences before taking a major action. See *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21 [96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576] (1976). The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not *arbitrary or capricious.* [emphasis added].

The United States Court of Appeals of the Fifth Circuit has also clearly enunciated the standard for reviewing the EPA's or Corps' decision. We reiterate:

A. *Standard of Review.*

■ Since the Clean Water Act does not set forth the standards for reviewing the EPA's or the Corps' decisions, we look to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* (1976), for guidance. *See Save the Bay, Inc. v. Administrator of the EPA,* 556 F.2d 1282 (5th Cir.1977); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692 (D.C.Cir.1975). In general, the APA provides that a court shall set aside agency findings, conclusions, and actions that are "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," or that fail to meet statutory, procedural or constitutional requirements. 5 U.S.C. §§ 706(2)(A), (B), (C), (D). This standard of review is highly deferential. A final agency decision is "entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). While the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and while "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.* at 416, 91 S.Ct. at 824. In *Overton Park,* the Supreme Court stated unequivocally that the "court is not empowered to substitute its judgment for that of the agency." *Id.; accord Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 290, 95 S.Ct. 438, 442, 444, 42 L.Ed.2d 447 (1974); *Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 118–19 (5th Cir. 1983); *City of Houston v. FAA,* 679 F.2d 1184, 1190 (5th Cir.1982).

*Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (1983). The Avoyelles court admonished the district court for having conducted a de novo trial on the wetlands issue and for having substituted its own wetlands determination for that of the ERA, instead of simply reviewing the agency's decision, as supported by the administrative record, under the arbitrary and capricious standard.

In this case, despite the recommendation in *Avoyelles,* we permitted plaintiffs to introduce evidence in their attempt to demonstrate that the Corps' decision to grant the six permits was arbitrary or capricious. We must examine the record—not as a chemist, biologist, or statistician, but as a reviewing court exercising its narrowly defined duty of holding agencies to certain minimal standards of rationality. We have reviewed the administrative record and conclude the agencies adequately considered

and disclosed the environmental impact of their actions, and that their conclusions were not arbitrary or capricious.[25]

The Corps developed an extensive administrative record in making its determination in each instance; it collected reports from its own expert consultants, as well as from the parties. The Corps also considered the possibility of other alternatives.

The plaintiffs' major assault on the Corps' decision to issue the permits deals with the Corps' "water dependency analysis." Put in a nutshell, the plaintiffs contend that since soybean production is not water dependent (this is undisputed), practicable alternatives are presumed to exist; and therefore, the Corps' decision to permit clearing of a "special aquatic site" (i.e., wetlands) for "non-water dependent activities" is clearly erroneous.

■ Corps' regulations [33 C.F.R. § 320.-4(b)(4)] and the 404(b) Guidelines [40 C.F.R. § 230.10(a)(3)] provide that a non-water dependent activity (such as agricul-tural cultivation) should not be permitted in a "special aquatic site"[26] if practicable alternative means or locations are available to carry out the proposed activity.[27] However, classification of an activity as "non-water dependent" does not serve as an automatic bar to issuance of a permit under the NEPA and Clean Water Act. The determination that a project is non-water-dependent simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives. *See Hough v. Marsh,* 557 F. 74 (D.Mass.1982); *Cf. 1902 Atlantic Ltd. v. Hudson,* 574 F.Supp. 1381, 1391 (E.D.Va.1983).

In each of the six permit proceedings, Col. York, District Engineer for the Corps of Engineers, conducted an evaluation of the proposed permits under the 404(b)(1) guidelines.[28] Col. York concluded that each of the proposed projects was non-water-dependent, and consistent with the Section 404(b) guidelines, he thus recognized that the existence of practicable alternatives would be presumed.[29] In evaluating

---

25. Counsel for Tensas, in oral argument, with vigor, indeed, asserted:

> Your Honor, I would like to begin by making an argument I resisted making the other day when we talked about what we were going to let into evidence and what we weren't. But Congress has made a delegation of authority under Section 404 of the Clean Water Act to the Corps of Engineers in the case of permit applications such as these to carry on an administrative review process and within the framework of applicable laws and relations to make a determination, and I think the Fifth Circuit has spoken to the scope of judicial review under those circumstances. * * * And I think the reason the Fifth Circuit did that is because the intention of Congress was not lost on the Fifth Circuit. Because if every single permit application that is reviewed by the Corps of Engineers in Vicksburg or anywhere else is going in every instance to be subjected to this sort of fly specking in the Federal District courts of the United States, somebody is going to have [to] prepare a judicial impact statement.

We do not agree that what we have is "fly specking"—counsel for plaintiff, in oral argument, noted that there were three points in the decision making process as far as the six permits are concerned that caused him concern: "One is should an E.I.S. be prepared. The next is the compliance with the 404B guidelines, and then we come to the public review test that considers all possible factors. Our case from our point of view, Your Honor, deals nothing at all with the public interest review test. We're dealing with the two procedural decision points along the way."

26. Wetlands are considered special acquatic sites. See 40 C.F.R. § 230.41.

27. 40 C.F.R. § 230.10(a)(3) provides, in full:

> Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in Subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

28. His analysis is fully set forth as Appendix E to the FONSI and Findings of Fact for each of the six permits.

29. Section 404(b) Evaluation Report at 1.

528

project alternatives, Col. York characterized the applicant's basic purpose was to increase soybean production or to increase net return on assets owned by the company.[30]

Colonel York examined various internal (those suitable for siting on the applicant's land) and external alternatives (those amenable for siting elsewhere). He first concluded that no environmentally preferable internal alternatives exist, since the entire tract in each case has been denominated as wetlands by EPA; hence, any clearing for agricultural use of the applicant's lands would entail disposal of fill material in wetlands and require a similar Section 404 permit evaluation.[31] Regarding external alternatives, Col. York considered detailed economic data pertaining to conversion activities, and lease or purchase of other lands. He concluded that "[b]ased on consideration of costs, reasonable availability, and the nature of the proposal itself, there are no practical alternatives that will allow the applicant to achieve the basic purpose of the proposed project." [32]

The plaintiffs insist, however, that other alternative uses of the property, such as timber harvesting and leasing for hunting are available.[33] They contend that the alternatives may not be viewed with the applicants' objectives in mind. More specifically, they claim that the applicants' objectives of increasing soybean production and increasing net return on real investments is not a proper viewpoint through which possible alternatives should be analyzed in accordance with the guidelines and policy of the NEPA and Clean Water Act. They would have the Corps consider the proposed activities and alternatives solely in terms of environmental maintenance, or lessening the adverse environmental effects of the project.

We reject these assertions. In the Preamble to the Guidelines, the EPA states that "... [w]e consider it implicit that, to be practicable, an alternative must be capable of achieving the basic purpose of the proposed activity." [34] The text of the EPA guidelines, 40 C.F.R. § 230.10(a)(2), provides that an "alternative is practicable if it is available and capable of being done after taking into consideration costs, existing technology, and logistics *in light of overall project purposes.*" [35] [emphasis added]. Thus, the Corps is not obligated to consider the possible alternatives exclusively with the object of lessening environmental impacts,[36] but rather it must take into account the objectives of the applicant's project. The applicants' goals of increased

30. Id.

31. Id.

32. *Id., See,* e.g., Westbank EA at 20, 21.

33. These other uses would not be economically feasible. Since nearly all merchantable timber has been removed from the tracts, it would take at least 30–40 years for the forests to regenerate before a commercial harvest could be made and about 40–50 years before the silvicultural use would realize a profit. [See Kramer Dep. at 83]. Lease of the property for hunting also does not represent a meaningful use of the property in terms of any significant economic return. Also, plaintiffs argue that the timber cutting which occurred on the tracts within the past 10–15 years was poor silviculture practice and that granting permits for agricultural conversion here merely rewards such practices. However, the Corps had no jurisdiction to regulate or otherwise control the applicants' land use practices in the past. Nor is there evidence in the record to suggest that the applicants improperly, as plaintiffs suggest, managed those timber resources.

34. 45 Fed.Reg. 85339.

35. *See also, South Louisiana Env. Council, Inc. v. Sand,* 629 F.2d 1005 (5th Cir.1980). The court similarly noted that NEPA requires a discussion of "alternatives to a project which would reduce environmental harm *while still achieving the goals to be accomplished by the proposed action ...*" [emphasis added] (629 F.2d at 1017).

36. In the previously cited portions of *Baltimore Gas v. NRDC, supra,* 462 U.S. at 93–97, 103 S.Ct. at 2251–52, the Supreme Court, in discussing the extent to which an agency must consider the environmental impact of its actions, stated: "... Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations." *See also Stryckers' Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (per curiam).

soybean production and increased return on investment are recognizable objectives against which alternatives may be considered.[37]

■ Here, the Corps properly categorized the applicants' proposed activity as non-water dependent. It considered other possible activities and sites and found that no practicable alternatives existed. There is nothing in the record that supports plaintiffs' claim that the Corps' analysis of alternatives and decision to issue the permits were arbitrary or capricious.

### THE SICILY ISLAND AREA LEVEE PROJECT

*Inadequacy of the FEIS*

■ Plaintiffs argue that further construction of the Sicily Island Levee Project be enjoined until "federal defendants complete an FEIS which adequately discloses the individual and cumulative impacts of project construction and wetland clearing and conversion". This court will consider in this opinion only plaintiffs' major argument that the Corps failed to disclose in the four FEISs for the Sicily Island Levee Project the environmental impacts of the project on some 17,300 acres of bottomland hardwoods, since it assumed these lands would be cleared with or without the project.

Before the Corps approved the Sicily Island project, many studies were made on the possible impacts the project would have. The Vicksburg District prepared a 1978 draft EIS. In August of 1979, the Corps released a final EIS. That FEIS was subsequently revised to include pertinent data concerning the establishment of the Tensas National Wildlife Refuge and to include results of biological assessments and consultation with the FWS and reissued in September 1981.

In 1978 the Corps began its information gathering process. The Corps conducted a survey of the landowners in the project area and found that 88% of the 19,743 acres of woodlands, or approximately 17,300 acres, would be cleared with or without construction of the levee project.[38] At that time land clearing of wetlands above the ordinary high water mark by private owners lands was not believed to be regulated by Section 404 of the Clean Water Act or subject to permitting by the Corps. The Corps, in preparing the 1979 FEIS, relied on this survey and did not discuss the environmental impacts the Sicily Island Project would have on the 17,300 acres of wetlands, since it assumed they would be cleared regardless of the project. The 1981 FEIS was prepared principally to discuss the mitigation to be caused by the establishment of the Tensas National Wildlife Refuge authorized by Congress in 1980, and it adopted the prior FEIS's statement of the environmental impact of the levee project.

The *Avoyelles I* decision, 473 F.Supp. 525 (W.D.La.1979), stated in dicta that all mechanized land clearing of wetlands was an activity regulated by the Clean Water Act and, therefore, subject to permitting by the Corps. However, it was not until the second portion of the bifurcated *Avoyelles* trial in *Avoyelles II*, 511 F.Supp. 278 (W.D. La., March 12, 1981), that the district court considered whether the tract in question (Lake Long tract) was included in "waters of the United States," [39] and held specifical-

---

**37.** In the bench opinion of *Nat'l Audubon Sec'y v. Hartz Mountain Dev. Corp.*, (No. 83–1534, D.N.J., Oct. 24, 1983) (attached as Exhibit 3 to federal defendants' memorandum of law), the United States District Court of New Jersey upheld a permit issued to Hartz Mountain to fill 127 acres of wetlands for construction of a commercial complex. It held that sufficient evidence of the unfeasibility of alternatives had been presented to overcome the presumption against discharge in a wetland for a non-water dependent project. The court concluded that feasible alternatives were not available, reject-

ing as impractical other possible sites offering a less attractive marketing package to prospective purchasers.

**38.** Sicily Island Levee Project FEIS at 5, 6, 36.

**39.** The court, at p. 281, phrased the issue of *Avoyelles II* in the following manner:

We must now consider the ultimate issue which was bifurcated and therefore not covered in our opinion of June 9, 1979: Was the Government's final wetland determination

ly that all "wetlands," regardless of how "dry" some may be, are included in "waters of the United States" and are subject to § 404 jurisdiction. *Avoyelles II* was affirmed by the Fifth Circuit on September 26, 1983. *Avoyelles III,* 715 F.2d 897 (5th Cir.1983).

The plaintiffs do not challenge the sufficiency of the 1979 FEIS. Instead, they are discontent with the 1981 FEIS because that document does not disclose or assess environmental impacts associated with the loss of the 17,300 acres which the documents assumed would be lost in any case.

The sufficiency of the 1979 FEIS is not challenged. The issue quickly narrows: Did the impact of Avoyelles require a supplemental FEIS as to the Sicily Island Levee Project? We think not.

Under the regulations of the Council of Environmental Quality (CEQ), an agency is required to supplement an original EIS if: (1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) there are significant new circumstances or information relevant to environmental concerns. 40 C.F.R. § 1502.9(c)(i) and (ii). The United States Court of Appeals for the Seventh Circuit has recently decided a case involving the question whether new information was sufficiently significant so as to require the preparation of a supplemental EIS. *See State of Wisconsin, et al v. Weinberger,* 745 F.2d 412 (1984). There, plaintiffs sued the Department of Defense demanding the preparation of a supplemental statement in connection with Project ELF, an extremely low frequency submarine communications system developed by the Navy. EISs had been prepared in 1972, 1975 and 1977 for several different proposals under the project. The project was shelved in 1978. It was reactivated in December 1981. Despite the presence of new information regarding the harmful biological effects of extremely low frequency elec-

tromagnetic radiation, a supplemental EIS was not prepared.

The court had occasion to state the significant new information test of 40 C.F.R. § 1502.9(c) several times throughout its opinion in *State of Wisconsin, et al, supra:*

". . . an original EIS may become inadequate when during the life cycle of a project its scope changes in any substantial way or if new circumstances arise or new information becomes available about previously unsuspected environmental impacts." (at 416).

\*    \*    \*    \*    \*    \*

"Thus, it seems clear that the principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the *extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS* ... The issue is whether the subsequent information *raises new concerns of sufficient gravity* such that another, formal in-depth look at the environmental consequences of the proposed action is necessary. The supplementation process is extensive and an agency's determination as to when one is or is not needed is entitled to some deference. *We hold, therefore, that an agency cannot have acted arbitrarily or capriciously in deciding not to file a SEIS unless the new information provides a seriously different picture of the environmental landscape such that another hard look is necessary.* [emphasis in original]. (at 418). "Our task is the limited one of determining whether or not the new information presents a seriously different picture of the likely environmental consequences of the proposed action not adequately envisioned by the original EIS, such that the

___

filed by the Federal defendants on March 26, 1979, correct so that the area designated therein as wetlands (shown in green on the survey attached thereto) is subject to the strictures of the CWA? Stated another way: Is the

Lake Long tract included in "waters of the United States" and more particularly, does it constitute a "wetlands" within the meaning of the regulations promulgated by the Corps under the § 404 program?

Navy's failure to act on it was arbitrary or capricious." (at 419–20).

"We are only to decide whether the evidence reveals that the new information presents a seriously different picture of the environmental impact of the proposed project from what was previously envisioned, such that the Navy acted arbitrarily or capriciously in deciding not to file a SEIS." (at 421).

An agency's decision of whether to supplement an initial EIS must be made in the light of a previous in-depth review of the likely consequences of the proposed action. No benefit is to be derived from taking another "hard look" if that view is taken from the same vantage point and overlooks the same environmental panorama. The decision in *Avoyelles* was not a "significant new circumstances or information" which required the preparation of an additional EIS. No new scientific or technical information was revealed which indicated that the project might have environmental effects which differed from those analyzed in the original EIS. Although the Corps did prepare an FEIS in 1981, this analysis was done solely to consider the mitigating impacts of the Tensas Wildlife Refuge. We conclude that the Corps was not obligated to prepare a supplemental FEIS now.[40]

## CONCLUSION

For reasons here stated, we decide that plaintiffs' request that the Corps re-open the Sicily Island EIS process is not warranted. We dissolve the temporary restraining order which has been in effect since the commencement of this action. We dismiss plaintiffs' complaint as failing to demonstrate in any manner that the Corps' decision to issue the 404 permits was arbitrary, capricious or an abuse of discretion.

[40.] As one court succinctly stated, "NEPA's rule of reason does not require rethinking of everything all the time." *Ventling v. Bergland,* 479 F.Supp. 174, 179 (D.S.D.1979), quoting *Sierra Club v. Andrus,* 581 F.2d 895, 906 (D.C.Cir.1978). The Supreme Court has noted: "Administrative consideration of evidence ... always creates a

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, on this the 20th day of September, 1984.

gap between the time the record is closed and the time the administrative decision is promulgated ..." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 554–555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978); *accord, Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 442 (5th Cir.1981).