**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs-Appellants,**

v.

**The CITY OF NEW YORK, et al., Defendants-Appellees.**

**No. 960, Docket 82–6026.**

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1982.

Decided Feb. 26, 1982.

Certiorari Dismissed April 19, 1982. See 102 S.Ct. 1963.

Bruce Terris, Washington, D. C. (Terris & Sunderland, Washington, D. C., Fried, Frank, Harris, Shriver & Jacobson, New

York City, Lanigan, O'Connel, Jacobs & Chazin, Basking Ridge, N. J., on the brief), for plaintiffs-appellants.

Arnold Roth, New York City (Rosenman Colin Freund Lewis & Cohen, New York City, on the brief), for defendant-appellee, John C. Portman, Jr.

Gaines Gwathmey, III, Asst. U. S. Atty., New York City (John S. Martin, Jr., New York City, of counsel), for defendants-appellees, Samuel R. Pierce, Jr. and James C. Watt.

Lorna Goodman, Asst. Corp. Counsel of the City of New York, New York City (Frederick A. O. Schwartz, Jr., New York City, on the brief), for defendant-appellee, The City of New York.

Before WATERMAN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

These are appeals from orders of the United States District Court for the Southern District of New York, Duffy, J., granting the defendants' motions for summary judgment and the judgment dismissing plaintiffs' complaint. At issue is a project aimed at revitalizing a portion of the Times Square area in the City of New York. Long before the City fathers began to extol the sights and thrills of "The Big Apple", they proclaimed the wonders of "The Crossroads of the World", Broadway and 42nd Street and the Times Square area immediately to the north. Unfortunately for the City, in recent years the wonders which had attracted and thrilled millions of visitors began to disappear. When the City fathers looked at the area in 1981, this is what they saw:

> Since World War II, the Broadway-Times Square area has experienced a deterioration of building stock, land use, and street environment resulting in increasingly, unproductive use of potentially valuable land, and in the appearance of uses which threaten Times Square's traditional public role. This decline was marked by a lack of significant construction in the area after World War II. During this time, fashionable hotels moved to Central Park South and to the east side of Midtown. The Times Square area hotels declined in quality and lost their prominent clientele. The area lost its monopoly on first-run movies. Falling patronage and sales forced high-quality restaurants and retail stores out of Times Square. In the place of these departed activities came more "action" movie houses, pornographic shops, shops catering to impulse buying, fast-food restaurants, soft-drink stands, topless bars, massage parlors, and pornographic book stores. In the 1970's this resulted in private mortgage foreclosures, in rem takings, tax arrears, reduced tax collections, building deterioration, the replacement of buildings with parking lots and disassemblage of property.
> Today Times Square is a blighted urban area. The characteristics contributing to this blighted environment are the underutilization of property in the area, high vacancy rates above the ground floor, the proliferation of pornographic uses, dilapidated store fronts, the number of lots in tax arrears, dirty and unsafe street conditions, and a high crime rate which requires increased allocation of police service to the area. These factors combine to reduce the attractiveness of the area to tourists and to most metropolitan residents and to threaten neighboring communities with the intrusion of blighting land uses.

(Record of Decision and Findings and Determinations of the City of New York and the New York State Urban Development Corporation Respecting the Times Square Hotel Project, 5.)

In 1972, defendant, John Portman, with the encouragement of the Mayor's office of Midtown Planning and Development, decided to build a hotel on the west side of Broadway between 45th and 46th Streets. In August, 1973, Portman was granted a special zoning permit, a parking permit, and a zoning map change authorizing the proposed construction. Economic conditions deterred further progress until 1978, when

a plan of cooperative public financing was devised. This involved ownership of the land by a subsidiary of the New York State Urban Development Corporation (UDC), a leaseback of the property to Portman, and a loan from the City to be funded by the United States Department of Housing and Urban Development (HUD). In August, 1978, the project was approved in concept by the New York City Board of Estimates. The Board authorized the Mayor to apply for a HUD grant of $15M, and increased this authorization to $21.5M in December, 1980. The City's participation was conditioned upon UDC's adoption of the project as a land use improvement project. On October 18, 1979, the Directors of UDC approved the general project plan and the initiation of UDC's participation in the project.

In the meantime, the Mayor's office of Midtown Planning and Development oversaw the preparation of a 300-page Environmental Review covering the proposed project. Shortly after this document was completed and circulated, the City was advised that a theater on the project site known as the Helen Hayes Theatre was eligible for listing on the National Register of Historic Places.

Pursuant to section 106 of the National Historic Preservation Act of 1966, 16 U.S.C. § 470f, and regulations thereunder, 16 C.F.R. §§ 800.1–.15, a Case Report relating to the Helen Hayes Theatre was submitted by the City to the New York State Historic Preservation Officer and the Advisory Council on Historic Preservation. On December 26, 1978, a Memorandum of Agreement was entered into permitting the demolition of the Helen Hayes Theatre. This Memorandum provided, among other things, for the possible use of parts of the theater in the hotel project and the use by preservation organizations of any other architecturally significant parts.

On February 18, 1981, the City inserted in the Federal Register a notice of intent to publish a Draft Environmental Impact Statement. The Draft Environmental Impact Statement was completed on May 22, 1981, and appropriate notice was published in the Federal Register on May 29, 1981. A public hearing was held on July 10, 1981, and the Court has reviewed the 213-page transcript of the proceeding. On August 12, 1981, a final 500-page Environmental Impact Statement was completed, and notice of completion was published in the Federal Register on August 21, 1981. The Statement described the proposed project as follows:

The proposed development is on the west side of Broadway between 45th and 46th Streets on a 74,300 square foot site. The design of the proposed project calls for a 50-story hotel with over 2,000 rooms, extensive convention and meeting facilities, restaurants and public areas, a 1,500-seat theatre and underground parking for 219 automobiles. The building will be open at street level to serve as an extension of Broadway Plaza, a pedestrian oriented project on the right-of-way of Broadway that the City is undertaking between 45th and 49th Streets. The building features a large open atrium around which the hotel rooms are situated. Shubert Alley, a feature of the theatre area between 44th and 45th Streets west of Broadway, will be extended under the hotel structure at street level northward to 46th Street.

At street level there will be a sidewalk cafe extending onto Broadway Plaza and retail shops. Vehicle access will be provided by a through roadway between 45th and 46th Streets adjacent to the hotel entrance. Pedestrian access will also be available from Broadway Plaza and the Shubert Alley extension.

Above the street will be two levels of retail space and the legitimate theater. The next three levels will provide meeting rooms, exhibition space and ballrooms. The main lobby will be above this meeting space and will include registration facilities, various restaurants and beverage facilities and retail shops. The atrium will extend 35 floors above this lobby to a revolving restaurant and lounge on the top floor. The hotel has been designed as a striking facility to be an attraction for City visitors.

(Final Environmental Impact Statement Proposed Times Square Hotel at 1–1 [hereinafter cited as Final E.I.S.]).

On October 6, 1981, plaintiffs brought two suits in New York State Supreme Court alleging that defendants had failed to comply with pertinent State statutes and regulations, particularly the New York State Environmental Quality Review Act. (N.Y.Envtl.Conserv.L. Art. 8 (McKinney 1973)).

On October 7, 1981, the instant action, based largely on federal statutes and regulations, was commenced in the United States District Court for the Southern District of New York. On October 14, 1981, the State actions were removed to the district court for the purposes of joint trial. However, they were remanded at the time the district court dismissed most of the federal claims. On January 7, 1982, the complaints in the remanded State actions were dismissed in New York State Supreme Court and the dismissal was affirmed by the Appellate Division of the Supreme Court on February 23, 1982.

On October 30, 1981 and November 4, 1981, plaintiffs moved for partial summary judgment. On November 13, defendants moved to dismiss the complaint. At the time these motions were made, there was uncertainty as to whether a theater adjoining the Helen Hayes Theatre, known as the Morosco Theatre, was eligible for inclusion in the National Register of Historic Places. This uncertainty was resolved on November 17, 1981, when the Secretary of the Interior held in favor of eligibility. In making this determination, the Secretary specifically recognized that "differences of opinion exist on the eligibility of the Morosco Theatre."

While awaiting the Secretary's determination, the parties stipulated that, if the Morosco Theatre was held to be eligible for registry, the parties would not object to an expedited consideration of the theatre's status vis-a-vis the project by the Advisory Council on Historic Preservation, pursuant to 36 C.F.R. Part 800. Accordingly, when the Secretary's decision was received, the matter was promptly referred to the Advisory Council, which held expedited hearings on November 19 and 20. A Memorandum of Agreement was executed on behalf of the Council, the City, and the New York State Advisory Council on Historic Preservation on the evening of November 20 and was signed by the Chairman of the Advisory Council on the evening of November 21. The Memorandum of Agreement provided that there were no feasible or prudent alternatives to demolition of the Morosco Theatre. It gave the City fifteen additional days to consider any possible practical alternatives to demolition and forbade any physical alteration of the Theatre during that period.

Plaintiffs then moved to amend their complaint to attack the proceedings before the Advisory Council. Although plaintiffs attacked the substance of the Memorandum of Agreement and the proceedings which led to its execution, their principal contention was that the Advisory Council's decision resulted from improper pressure emanating from the White House in Washington. On December 7, 1981, the district court handed down an opinion and order granting defendants' motion to dismiss all of plaintiffs' claims except the State claims that were remanded, one claim that involved issues of State and local law which was placed on the suspense calendar pending resolution of the parallel State court claims, and plaintiffs' claim that the Morosco Memorandum of Agreement was consummated improperly. At the same time, the district court denied plaintiffs' motion for a temporary injunction. An appeal to this Court followed. We remanded to the district court with instructions to issue a preliminary injunction. Recognizing, however, that continued delay of the project would entail considerable expense and that the very existence of the project might be at stake because the financial "package" for the project might collapse, we urged the district court to expedite final disposition of plaintiffs' claims.

In compliance with our suggestion, the district court ordered expedited discovery

and tried the issues surrounding the Morosco Theatre Memorandum of Agreement on January 21 and 22, 1982. By an opinion and order dated February 11, 1982, the district court dismissed plaintiffs' last claims. Another appeal followed, together with a motion for a temporary injunction. On February 18, 1982, this Court granted the injunction pending argument of the appeal on the merits which was expedited to February 23, 1982. Argument has been had, and, after due consideration, we now affirm the judgment and orders appealed from.

## DISCUSSION

### I

 Although the parties have ·submitted thousands of pages of affidavits, testimony, memoranda and briefs covering the plethora of claims asserted by appellants, the basic issue is whether an adequate showing has been made that demolition of the two theaters is necessary. Where, as here, there is federal action significantly affecting the quality of human environment, a detailed statement concerning alternatives to the proposed action is required. 42 U.S.C. § 4332(C)(iii). That statement need not contain an exhaustive discussion of alternatives and variables of alternatives; it is sufficient in scope and detail if it permits an intelligent choice. *Monroe County Conservation Council v. Adams*, 566 F.2d 419, 425 (2d Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

The only alternatives to demolition of the Helen Hayes Theatre and the Morosco Theatre would be to build over them or around them. The reasons why both of these alternatives were rejected are set forth in the Environmental Impact Statement:

During the development of designs for the proposed project on the 45th-46th Street site at Broadway a number of different design concepts were examined in order to determine the feasibility of saving the theatres that presently occupy that site. Alternatives were examined that involved building around the theatres as well as building the hotel over them.

The construction of the hotel on the site without using the area of the Helen Hayes Theatre results in a substantially smaller facility which can not provide the convention and meeting rooms required for a major convention hotel (a ballroom for a facility of this size requires at least 25,000 square feet). It also could not include a new theatre, and most of all it would preclude an atrium—the focus and distinguishing feature of the proposed hotel, which is expected to make it a major attraction of the Times Square area. Without these features, the project was judged unlikely to be the magnet that expands the functions of an area that currently has its greatest appeal only during theatre hours and is unable to retain the theatre going population for pre- or post-theatre activities.

Analyses of the feasibility of building around and spanning the Helen Hayes Theatre indicated that the atrium concept could be retained, but the convention and meeting rooms would still be inadequate. In addition, the main hotel entrance would have to be on Broadway. This is logistically and urbanistically unsatisfactory, as it conflicts with the design of Broadway Plaza and precludes having the hotel's pedestrian focus on Broadway, where it should be. In addition, there simply would not be sufficient land area left to properly serve pedestrians, passenger cars or taxis, and service trucks. Further, because of the location of the Helen Hayes Theatre, the major vertical element of the hotel design, i.e. the elevators, would be in a non-functional location and would render the entire structure logistically infeasible.

Final E.I.S. at 6–4 to –5.

The Environmental Impact Statement also points out:

The building will be open at ground level so that pedestrians can move underneath the structure in a brightly lighted environment with cafes and shops. The openness on the site will compliment Broad-

way Plaza and will, in effect extend its pedestrian amenities and services.

Final E.I.S. at 3–3.

One need be neither an architect nor an engineer to recognize that this concept of an open pedestrian walkway is incompatible with the continued existence of two theater buildings occupying over 25,000 square feet of space in the walkway area. Significantly, even without the benefit of the Environmental Impact Statement's alternative design studies, the New York State Historic Preservation Officer and the Advisory Council on Historic Preservation concluded that there were no feasible and prudent alternatives to the demolition of the Helen Hayes Theatre and that it was in the public interest to proceed with the proposed hotel project. This determination was the basis for the December 26, 1978 Memorandum of Agreement. *See* 36 C.F.R. § 800.6(b)(6). The Environmental Impact Statement disclosed, of course, that this Memorandum of Agreement had been entered into.

■ Appellants contend that when the Morosco Theatre was declared eligible for National Registry, appellees should have prepared a supplemental Environmental Impact Statement. This argument was properly rejected by the district court. The Environmental Impact Statement pointed out that there were three theaters on the proposed site, the Helen Hayes, the Morosco, and the Bijou. Three pages of the Environmental Impact Statement were devoted to a description of the Morosco Theatre and its history. The Environmental Impact Statement's discussion of alternatives did not deal only with the Helen Hayes Theatre, but with all three theaters. The same considerations which made the retention of the Helen Hayes Theatre infeasible also militated against the continued existence of the Morosco Theatre. A supplemental Environmental Impact Statement should be prepared if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Under the circumstances of this case, the Morosco Theatre's eligibili-

ty for National Registry listing did not fall within the provisions of this regulation. *See Inman Park Restoration, Inc. v. Urban Mass Transportation Administration*, 414 F.Supp. 99, 118–19 (N.D.Ga.1976), *aff'd* 576 F.2d 573 (5th Cir. 1978). We have already noted that the New York State Historic Preservation Officer and the Advisory Council on Historic Preservation also determined that there were no feasible and prudent alternatives to the demolition of the Morosco Theatre.

## II

Although the City fathers have been behind the proposed hotel project since it was first conceived in 1972, appellants contend that the Mayor decided to proceed without proper approval by the Board of Estimates. This claim was made in appellants' State court actions which were remanded, and the dismissal of those actions in the State Supreme Court appears to be res judicata on this issue. *See Winters v. Lavine*, 574 F.2d 46, 54–56 (2d Cir. 1978); *Reilly v. Reid*, 45 N.Y.2d 24, 27–31, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978). Assuming for the argument that it was not, we believe that the district court did not err in rejecting appellants' contention, and we affirm the dismissal of this claim substantially for the reasons stated in the district court's opinion.

## III

Appellants contend that the Memorandum of Agreement covering the Helen Hayes Theatre contained an "implicit condition" that the demolition of the Theatre would be justified only if there was a reasonable expectation that the project would be constructed. Relying on Portman's expressed fears concerning the possible withdrawal of financial commitments, appellants contend that it would be a clear violation of this Memorandum of Agreement to permit demolition. The fears which Portman expressed were based upon the continued harassment and delay resulting from appellants' litigation. It comes with ill grace for appellants to now urge this same delay as grounds for halting the project.

Appellants have made no showing that the project will not move ahead rapidly once appellants are no longer able to enjoin such progress.

## IV

When an application for federal aid is made under the Housing and Community Development Act, 42 U.S.C. § 5301 et seq., the applicant must identify all affected properties which "as determined by the applicant" may meet the criteria for listing in the National Register of Historic Places. 42 U.S.C. § 5318(c)(7). The regulations governing the Advisory Council on Historic Preservation, 36 C.F.R. §§ 800.1–.15 provide that "[i]f either the Agency Official [the Mayor] or the State Historic Preservation Officer finds that a property meets the National Register Criteria or a question exists as to whether a property meets the Criteria, the Agency Official shall request a determination of eligibility from the Secretary of the Interior in accordance with 36 CFR Part 63." 36 C.F.R. § 800.4(3). "A question on whether a property meets the Criteria exists when the [City] and the State Historic Preservation Officer disagree or when the [City] determines that a question exists." 36 C.F.R. § 1204.2(c).

Appellants contend that the City should have asked the Secretary of the Interior to determine whether the entire Times Square theater district was eligible for listing on the National Register of Historic Places. Putting aside the question whether any person could reasonably conceive of the entire Times Square area as an historic landmark, the record shows that, as of October 27, 1981, the only disputed properties were the Morosco Theatre, the Guild Embassy 5 Theatre, the Bijou Theatre, and the Picadilly Hotel. Moreover, although the parties stipulated that appellants might file National Register nomination forms with the Secretary of the Interior covering all four properties, appellants requested the Secretary to make a determination of eligibility only with respect to the Morosco Theatre. Appellants' present insistence that the entire theater area should have been listed raises a question whether appellants are more interested in delaying the project than in preserving historic landmarks.

In any event, the record establishes beyond dispute that the City had a 200-page Historic Analysis of the site of the proposed project made by Soil Systems, Inc. of Marietta, Georgia, which found that only the Helen Hayes Theatre was worthy of inclusion in the National Register. The Landmark Preservation Commission concurred. Moreover, and most importantly, it is undisputed that the City and the State Historic Preservation Officer did not disagree concerning the eligibility for national registration of the so-called theater district. Instead, they agreed that the entire district was not eligible for listing.

We find no error in the district court's summary dismissal of these claims.

## V

Appellants' final contention of significance concerns the Memorandum of Agreement covering the Morosco Theatre. When this matter was before this Court on a prior appeal, appellants asserted vigorously that undue influence from Washington deprived the Advisory Council on Historic Preservation of its ability to perform its delegated duties as an independent advocate for the preservation of the nation's historic and cultural heritage. We remanded to the district court to permit discovery and a hearing, which have now been had. The district court found that the evidence showed a "thorough and reasoned consideration of the Morosco Theatre by the Advisory Council devoid of extraneous influences." This finding is supported by the record.

We find no merit in appellants' contention that the hearings, expedited pursuant to stipulation, were not fairly conducted or that appellants were prevented from presenting their views. As already pointed out, the situation with regard to the Morosco Theatre was substantially the same as that of the Helen Hayes Theatre. Nevertheless, appellants' architectural expert was given ample opportunity to present his pro-

posed feasible alternative. The Council concluded that the proposed alternative was not feasible, and there was substantial basis for this determination.

We discern no basis for complaint in the fact that the Council gave appellants and their allies an additional fifteen day period in which they might attempt to change the City's well-reasoned position on the issue of feasibility.

### DISPOSITION

We have considered all of the arguments presented by appellants on this appeal and find no merit in them. Accordingly, the judgment of the district court is affirmed. The temporary injunction staying demolition is vacated.

AFFIRMED.

The mandate shall issue forthwith.