**LOUISIANA WILDLIFE FEDERATION, INC., et al., Plaintiffs-Appellants,**

v.

**Dennis J. YORK, Colonel, et al., Defendants-Appellees.**

No. 84–4699.

United States Court of Appeals, Fifth Circuit.

May 31, 1985.

James T.B. Tripp, New York City, Osborne, McComiskey & Richardson-Harp, Michael Osborne, New Orleans, La., Jerry Jackson, Washington, D.C., for plaintiffs-appellants.

Cook, Yancey, King & Galloway, F. Drake Lee, Jr., Shreveport, La., for Tensas Delta, et al.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, Joseph E. LeBlanc, Jr., Stephen C. Carleton, New Orleans, La., for Westbank Planting.

F. Henry Habicht, II, Asst. Atty. Gen., Land & Nat. Resources Div., U.S. Dept. of Justice, Jacques B. Gelin, David C. Shilton, Washington, D.C., for federal defendants.

Ledoux R. Provosty, Jr., Alexandria, La., for other interested parties.

Before GOLDBERG, RUBIN, and HILL, Circuit Judges.

PER CURIAM:

Six environmental organizations object to the issuance by the U.S. Army Corps of Engineers of six individual permits allowing private landowners to clear and convert to agriculture approximately 5200 acres of bottomland hardwood wetlands. They also oppose the construction of the Sicily Island Area Levee Project (the Project), a federal flood control project to abate backwater flooding in a 75,000 acre area of Catahoula Parish, Louisiana, without an additional Environmental Impact Statement (EIS) to supplement the Corps' 1981 EIS. As to the six individual permits, we agree with the district court that the Corps properly followed both the National Environmental Policy Act (NEPA), and the Environmental Protection Agency's regulatory guidelines in making its determination. As to the construction of the Project, however, we hold that the Corps failed to give adequate consideration to the question of whether the 1981 EIS must be revised in light of our decision in *Avoyelles III*.[1] Consequently, we vacate that part of the district court's opinion which dealt with this issue and remand to the district court for the purposes of requiring the Corps to perform an adequate analysis of whether a supplemental EIS is required.

The district court opinion efficiently distilled a voluminous record and described in detail both the nature of the Sicily Island Project and the physical characteristics of the six tracts affected by the permit applications.[2] We, therefore, do not attempt to repeat the factual background of this case.

### I.

The six permits granted by the Corps authorize the agricultural conversion of 5200 acres of wetlands. For environmental protection purposes, such wetlands are denominated "special aquatic sites."[3] Both the Environmental Protection Agency's Guidelines and the Corps of Engineers' regulations treat all special aquatic sites as worthy of extra protection, and state as "[t]he guiding principle ... that degradation or destruction of special sites may

---

**1.** *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983).

**2.** *Louisiana Wildlife Federation v. York,* 603 F.Supp. 518 (W.D.La.1984).

**3.** *See* 40 C.F.R. § 230.41 (1984).

represent an irreversible loss of valuable aquatic resources." [4]

Such heightened solicitude for wetlands is manifest in the regulations stating the considerations that must be taken into account when evaluating a proposed alteration to wetlands acreage. When a discharge of dredged or fill material is proposed, the Corps' Guidelines prohibit issuance of a permit if there is a "practicable alternative that would have less adverse impact on the aquatic ecosystem...." [5] A "practicable alternative," in turn, is defined as one that is, "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." [6] With respect to wetlands, however, the Guidelines specify:

> [w]here the activity associated with a discharge which is proposed for a special aquatic site ... does not require access or proximity to or siting within the special aquatic site in question to fulfill the basic purpose (i.e. is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.[7]

"Thus, the guidelines couple a general presumption against all discharges into aquatic ecosystems with a specific presumption that practicable alternatives to the fill of wetlands exist." [8]

■ In each of the six permit-application proceedings, the Corps characterized the applicant's basic purpose for the project as being, "to increase soybean production or to increase net return on assets owned by the company." [9] It is undisputed that soybean production is a non-water dependent activity. As shown above, this fact "necessitate[s] a more persuasive showing than otherwise concerning the lack of alternatives." [10]

■ The environmental protection organizations argue on appeal that the applicants failed to make the required showing, and that the Corps erroneously granted them permits by interpreting "practicable alternatives" to mean "profit-maximizing alternatives." In addition, they contend that the Corps erred in viewing the alternatives with the applicants' objectives in mind instead of with an eye towards environmental maintenance. Both arguments must be rejected.

The first contention is simply not borne out by the record. There is nothing in the Corps' reports to show that profit-maximization was *a* consideration, let alone *the* primary factor in the alternatives analysis.[11] The Corps did view the economic feasibility of alternatives, a permissible criterion under both the Environmental Protection Agency's Guidelines and the stated objectives of the permit applicants. However, in granting several of the applications, the alternative selected by the Corps did not allow the applicant to clear the entire tract (the profit-maximizing position) as it had originally requested. Instead, the Corps carefully limited the clearing allowed under the permits so as to forbid land

4. *Id.* § 230.1(d); *see also* 33 C.F.R. § 320.4(b)(1) (1984).

5. 40 C.F.R. § 230.10(a) (1984).

6. *Id.* § 230.10(a)(2).

7. *Id.* § 230.10(a)(3).

8. *Hough v. Marsh,* 557 F.Supp. 74, 82 (D.Mass. 1982).

9. *See, e.g.,* Plaintiffs' Exhibit 4, "Tensas Delta Land Company Evaluation of the Discharge of Dredged Material in Compliance with Section 404(b)(1) Guidelines" at 1.

10. *Hough v. Marsh, supra,* 557 F.Supp. at 83. *Cf. 1902 Atlantic Ltd. v. Hudson,* 574 F.Supp.

1381, 1398 (E.D.Va.1983) (finding of water dependency is not a prerequisite to fill under the Clean Air Act, but is a factor to consider in the application process).

11. *See, e.g.,* Plaintiffs' Exhibit 4, "Tensas Delta Land Company Evaluation of the Discharge of Dredged Material in Compliance with Section 404(b)(1) Guidelines" at 1; Plaintiffs' Exhibit 11, "Revised Environmental Assessment ... [Bayou Macon]" at 20–21, 23–25; Plaintiffs' Exhibit 5, "Revised Environmental Assessment ... [Bayou Louis]" at 13, 15–17; Plaintiffs' Exhibit 9, "Revised Environmental Assessment ... [Duck Creek]" at 13, 15–17.

clearance below certain elevations, require maintenance of uncleared buffer zones on each side of streams traversing the tracts, require turnrows to be seeded and maintained in suitable grass, and mandate the application of the Best Management Practices required by the Louisiana Department of Natural Resources.[12] The corps thus chose alternatives that reduced both the applicants' profit and the economic efficiency of their proposed operations in order to preserve other environmental values.

■ The environmental protection organizations' second contention, that the alternatives may not be viewed with the applicant's objectives in mind, is not substantiated by either case law or the applicable regulations. As the district court recognized, the Preamble to the Guidelines states, "... [w]e consider implicit that, to be practicable, an alternative must be capable of achieving the best purpose of the proposed activity."[13] In turn, the text of the Guidelines provides that an alternative is practicable if it is available and capable of being done after taking into account costs, existing technology and logistics in light of the overall project purposes.[14] Under these Guidelines, therefore, not only is it permissible for the Corps to consider the applicant's objective; the Corps has a duty to take into account the objectives of the applicant's project.[15] Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.

The case law, although sparse, is in accord with our conclusion. In *Hough v. Marsh, supra,* residents of Edgartown, Massachusetts challenged a Corps permit authorizing the filling of a coastal tract to construct two private homes and a tennis court. The District Engineer had found that the project was not "water dependent," and undertook the requisite examination to discover the existence of "practicable alternatives." The Engineer defined the basic purpose of the project as "providing two homes and a tennis court."[16] Although the district court remanded for the landowners to demonstrate more clearly that no practicable alternatives to the proposed fill existed, the court did not question the Engineer's formulation of the project's objective, and did not suggest that the alternatives were not considered from the proper perspective.[17]

■ The district court's findings that the Corps properly analyzed all six permit applications and correctly decided to grant permission to clear the tracts for agricultural use is amply supported by the record. Nothing in it convinces us that the Corps' actions were arbitrary, capricious, or otherwise not in accordance with law, the sole standards by which we review such actions.[18]

## II.

■ The Sicily Island Levee Project is a federally funded agricultural flood control and drainage plan designed to reduce the frequency and duration of backwater flooding throughout the 75,000 acre project area by the use of backwater levees and other drainage works.

**12.** *See, e.g.,* Plaintiffs' Exhibit 3, "Revised Environmental Assessment ... [Tensas Delta Land Company]" at 16–17; Plaintiffs' Exhibit 8, "Revised Environmental Assessment ... [Bayou Louis]" at 15–16.

**13.** 45 Fed.Reg. 85339. *See Louisiana Wildlife Federation v. York, supra,* 603 F.Supp. at 528.

**14.** *See* 40 C.F.R. § 230.10(a)(2) (1984).

**15.** *See South Louisiana Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1017 (5th Cir.1980) (NEPA requires a discussion of alternatives to a project which would reduce environmental harm while still achieving the goals to be accomplished by the proposed action).

**16.** 557 F.Supp. at 83.

**17.** *Id.* at 83–84. *See Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 684 F.2d 1041, 1047 (1st Cir.1982). *Cf. Shoreline Associates v. Marsh,* 555 F.Supp. 169, 179 (D.Md.1983), *aff'd,* 725 F.2d 677 (4th Cir.1984).

**18.** *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983).

The Corps' final EIS on the Project was submitted in 1981. The environmental protection organizations argue that the Environmental Protection Agency failed to perform a mandatory duty imposed by the Clean Air Act [19] to review and comment on this final EIS. The district court did not address this claim in its opinion, but it was asserted in the plaintiffs' amended complaint, and is properly before us.[20]

The EPA did comment on a 1978 draft EIS, the final form of which was released in 1979. The environmental protection organizations do not challenge the sufficiency of this EIS, nor do they contend that the Environmental Protection Agency's comments were inadequate or did not fulfill their statutory purpose. Instead, they assert that the Agency should have reviewed and commented on the 1981 revised EIS, which included data concerning the establishment of the Tensas National Wildlife Refuge. The 1981 EIS specifically adopted the prior EIS statement of the environmental impact of the levee project.[21] The issue narrows, therefore, to whether the EPA was required to review the 1981 EIS after it had already commented on the 1978 EIS.

The answer must be no. There is no indication that the Environmental Protection Agency found the 1978 draft EIS to be "unsatisfactory from the standpoint of public health or welfare or environmental quality."[22] If it had, it would have published this determination and referred the matter to the Council on Environmental Quality.[23] There is an indication that the Agency thought the draft was "inadequate," but such a finding is obviously not the same as "unsatisfactory," and did not require any further EPA action. The EPA had fully reviewed the environmental impact of the levee project in 1978, and the Agency's silence on the statement's subsequent incorporation into a revised document concerning the same project should be construed as showing the Agency's continued approval.[24]

III.

Finally, the environmental protection organizations contend that the Corps erred in not submitting a supplemental EIS on the Project. To understand this objection to the Project, we must briefly describe the preparatory work performed by the Corps on the final EIS, as well as the *Avoyelles* litigation [25] which concerned acreage similar to that affected by the Project.

The Corps' final EIS on the Project noted that, of the 75,000 acres involved, 21,100 acres are bottomland hardwood forests, and of these, 1,357 acres are classified as wetlands. The Corps surveyed the property owners of the 21,100 acres, and discovered that 82%, or 17,300 acres, would be cleared even if the Project were not under-

**19.** 42 U.S.C. § 7609(a) provides as follows:
The Administrator shall review and comment in writing on the environmental impact of any matter relating to duties and responsibilities granted pursuant to this chapter or other provisions of the authority of the Administrator, contained in any (1) legislation proposed by any Federal department or agency, (2) newly authorized Federal projects for construction and any major Federal agency action (other than a project for construction) to which section 4332(2)(C) of this title applies, and (3) proposed regulations published by any department or agency of the Federal Government. Such written comment shall be made public at the conclusion of any such review.

**20.** *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 488 fn. 7 (5th Cir.1984); *Bliss v. Equitable Life Assurance Society of United States,* 620 F.2d 65, 70 (5th Cir.1980).

**21.** *Louisiana Wildlife Federation v. York, supra,* 603 F.Supp. at 1085.

**22.** 42 U.S.C. § 7609(b).

**23.** *Id.*

**24.** *See Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457, 500 (D.Kan.1978), *aff'd,* 602 F.2d 929 (10th Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir.1973).

**25.** *Avoyelles Sportsmen's League, Inc. v. Marsh,* 473 F.Supp. 525 (W.D.La.1979) (*Avoyelles I*); *Avoyelles Sportsmen's League, Inc. v. Alexander,* 511 F.Supp. 278 (W.D.La.1981) (*Avoyelles II*); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983) (*Avoyelles III*).

taken.[26] On the basis of this survey, the Corps concluded that no adverse impact on the functional ecological values of the 17,-300 acres could be attributed to the Project because conversion of this property to agriculture was not in any way dependent on the Project.

The *Avoyelles* litigation concerned the Lake Long Tract which contained approximately 20,000 acres in Avoyelles Parish, Louisiana. The owners had decided that the land could be put to agricultural use, and had begun a large-scale program of deforestation. This program was halted, however, first by order of the Corps pending a wetlands determination, and then by a citizens' suit seeking declaratory and injunctive relief against the owners' landclearing activities.

After a bifurcated trial, the district court held that over ninety percent of the Lake Long Tract was wetlands,[27] and that a permit from the Corps was required for the landclearing activities on that acreage.[28] On appeal, the Fifth Circuit agreed that a private landowner's clearing of wetlands for agricultural use is subject to the permit requirements of the Corps of Engineers under Section 404 of the Clean Water Act.[29] The district court's wetlands determination was set aside, however, and the Environmental Protection Agency's determination was reinstated.[30]

The environmental protection organizations argue in this case that the 1981 final EIS is insufficient because it did not disclose or assess the environmental impacts associated with the loss of the acreage that the Corps assumed would be cleared if the Project were not undertaken. They contend, correctly, that the effect of *Avoyelles III* is to subject this acreage to the requirements of the Corps' permit application process. The Corps' initial assumption that 82% of the forested acres would be cleared regardless of the project, therefore, is no longer tenable, as the Corps is now able to "control" how much land can be cleared. They urge us to find that the district court erred in holding that the Corps was not required to supplement its 1981 final EIS in the light of the decision in *Avoyelles III.*

### A.

No specific statutory requirement ordains the supplementation of an EIS. The Corps' regulations, however, dictate that "[a] Supplement to the draft or final EIS on file will be prepared whenever *significant impacts* resulting from changes in the proposed plan or *new significant impact information,* criteria or circumstances relevant to environmental considerations *impact on the recommended plan or proposed action ....*"[31] Similarly, the Council on Environment Quality's regulations require an agency to supplement an EIS if:

(i) The Agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.[32]

The district court held that, under these regulations, "[t]he decision in *Avoyelles* was not a 'significant new circumstance or information' which required the preparation of an additional EIS" because "[n]o new scientific or technical information was revealed which indicated that the project might have environmental effects which differed from those analyzed in the original EIS."[33] In effect, because the opinion contained no data that is explicitly environ-

---

**26.** Final Environmental Impact Statement, Flood Control, Mississippi River and Tributaries Tensas Basin, Red River Backwater Area Sicily Island, Louisiana, at 5–6 (September, 1981).

**27.** *Avoyelles II, supra,* 511 F.Supp. at 291.

**28.** *Avoyelles I, supra,* 473 F.Supp. at 531–35.

**29.** *Avoyelles III, supra,* 715 F.2d at 920–22.

**30.** *Id.* at 917–918.

**31.** 33 C.F.R. § 230.11(b) (1984) (emphasis added).

**32.** 40 C.F.R. § 2502.9(c)(1) (1984).

**33.** *Louisiana Wildlife Federation v. York, supra,* 603 F.Supp. at 531.

mental, the district court found that there would be no point in requiring a supplemental EIS that merely would "overlook the same environmental panorama."[34]

■ This is an unduly restrictive interpretation of the Corps' regulations. As recently explained by the Seventh Circuit in *Wisconsin v. Weinberger*,[35] "The principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS."[36] The issue is not whether the new information is directly environmental but whether, whatever its nature, it "raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary."[37] That is, whether it "provides a *seriously* different picture of the environmental landscape such that another hard look is necessary."[38]

■ The focus of the inquiry is not limited solely to the scientific or technical aspects of the new information. Instead, the new information must be evaluated in terms of the likely environmental consequences that follow from the subsequent data. Even if the new information is not technological, therefore, if it "presents a seriously different picture of the environmental impact of the proposed project from what was previously envisioned,"[39] it is significant new information and is suffi-

cient to require an agency to supplement an original EIS.[40]

### B.

Because we reject the district court's conclusion that *Avoyelles III* was not the *kind* of new information that could warrant a supplemental EIS, we turn to the question of whether *Avoyelles III* does in fact warrant a supplemental EIS. We hold that the Corps' decision not to file a supplemental EIS was unreasonable, since the plaintiffs raised a substantial environmental issue concerning approximately 40% of the forested areas within the project area. Although the Corps need not necessarily prepare a supplemental EIS, it must reconsider its assumption that these acres will be cleared regardless of the Project. If the Corps determines that there is a reasonable possibility that a significant number of these acres will not be cleared except for the Project, and that therefore the Project may have significant additional impacts not considered in the final EIS, then the Corps must prepare a supplemental EIS.

■ In determining whether a supplemental EIS is required, the legal standard is essentially the same as the standard for determining the need for an original EIS.[41] If, as a result of new circumstances, the project may have a "significant" impact upon the environment that was not considered in the original EIS, then a supplemental EIS is required.[42] "It is the initial responsibility of the Corps to apply this standard and decide whether or not a supplemental EIS is necessary. If a party affected by that decision challenges it in

---

34. *Id.*

35. 745 F.2d 412 (7th Cir.1984).

36. *Id.* at 418.

37. *Id.*

38. *Id.* (emphasis in the original).

39. *Id.* at 421.

40. *But see Natural Resources Defense Council, Inc. v. City of New York*, 672 F.2d 292 (2d Cir.), *cert. dismissed*, 456 U.S. 920, 102 S.Ct. 1963, 72

L.Ed.2d 462 (1982). *But cf. Conservation Law Foundation of New England, Inc. v. General Services Administration*, 707 F.2d 626 (1st Cir. 1983).

41. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981). *Cf. Wisconsin v. Weinberger*, 745 F.2d 412, 417 (7th Cir.1984) *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir.1980); *Monarch Chemical Works, Inc. v. Thone*, 604 F.2d 1083, 1087 (8th Cir.1979).

42. *Environmental Defense Fund v. Marsh, supra*, 651 F.2d at 992.

court and raises a 'substantial environmental issue,' the reviewing court should uphold the agency's decision only if it is reasonable, rather than use the deferential 'substantial evidence' standard." [43]

■ Under *Marsh,* although the Corps has the initial responsibility of deciding whether a supplemental EIS is necessary, a party challenging the Corps' decision not to file a supplemental EIS has two burdens: First, it must raise a "substantial environmental issue." [44] NEPA does not require that an agency consider the import of any new circumstance, however small. In order to warrant a supplemental EIS, the new circumstance must "present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." [45] Second, the plaintiff must show that, with respect to this substantial environmental issue, the Corps did not act reasonably. "The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and in good faith on a reviewable environmental record. If the decision is reasonable, 'the determination must be upheld.' " [46]

In our view, the environmental protection organizations met both of these burdens. First, they raised a substantial environmental issue concerning the effect of the Project on 17,300 acres of bottomland hardwood forests. In its original EIS, the Corps did not consider the environmental impacts of the Project on this area because it assumed that the land would be cleared even if the Project were not undertaken.

It reasoned that since the area would be cleared anyway, the Project would not cause any additional adverse impacts.

As a result of *Avoyelles III,* however, these 17,300 acres of forestland might not be cleared. Under *Avoyelles III,* the land may be cleared only if the proposed clearances meet the requirements of the Section 404 permit process. [47] The Corps has never even claimed to have considered whether, under *Avoyelles III,* the land qualifies for clearance. Since it has never been determined whether or not the planned clearances do meet the requirements of Section 404, it is an open question whether this land will actually be cleared. If the land is not cleared, then it is also an open question whether or not the Project will have adverse impacts on the area. Thus far, the Corps has avoided taking any look at all at the impacts of the Project on this area, let alone a hard look.

■ In order to raise a substantial environmental issue, a party need not show that the proposed project *will* have significant adverse impacts that the Corps has not considered. It must show only that the project *may* have such impacts. "[I]f the court finds that the project *may* cause a significant degradation of some human environmental factor ..., the court should require the filing of an impact statement or grant ... such other equitable relief as it deems appropriate." [48]

On a previous occasion, we noted that "significant" is "a chameleon-like word that takes its functional meaning from its

**43.** *Id.* (*citing Hiram Clarke Civil Club, Inc. v. Lynn,* 476 F.2d 421, 424–25 (5th Cir.1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973)).

**44.** *Id.*

**45.** *Wisconsin v. Weinberger, supra,* 745 F.2d at 421.

**46.** *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 644 (5th Cir.1983) (*quoting Save the Bay, Inc. v. United States Corps of Engineers,* 610 F.2d 322, 325 (5th Cir.), *cert. denied,* 449 U.S. 900,

101 S.Ct. 269, 66 L.Ed.2d 130 (1980)), *quoted in Vieux Carre Property Owners, Residents & Associates, Inc. v. Pierce,* 719 F.2d 1272 (5th Cir. 1983). *See also Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 98, 103 S.Ct. 2246, 2253, 76 L.Ed.2d 437 (1983).

**47.** 715 F.2d at 920–22.

**48.** *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973) (emphasis added). *See also Louisiana v. Lee,* 758 F.2d 1081, 1084 (5th Cir.1985).

context." [49] Here, we have no doubt that the potential effect of the Project on 17,300 acres of forest is "significant." This area constitutes 82% of the total amount of forest affected by the Project. Although there was evidence in the record that 9,000 of these acres have already been cleared, even if only 8,000 acres of uncleared forest remain, this is still more than twice the number of acres of forest that were the subject of the Corps' original EIS. Since the Corps believed that the potential impacts of the Project on 3,800 acres of forest were sufficient to warrant an EIS, we assume that the potential impact of the Project on 8,000 additional acres of forest is sufficient to warrant a supplemental EIS.[50]

Second, we find that the environmental protection organizations not only met their burden of raising a substantial environmental issue; they also demonstrated that the Corps acted unreasonably with respect to that issue. The Corps did not consider the impact of the Project on the 17,300 acres of forest in question because it assumed that this land would be cleared regardless of the Project. It based this assumption on a survey of landowners within the project area which showed that the owners of 17,300 acres of forested land planned to clear their land even if the Project was not undertaken.

As a result of *Avoyelles III,* however, this basis has been undermined. Under *Avoyelles III,* the land in question cannot be cleared simply if the landowners want to. If the proposed clearances do not meet the requirements of Section 404, then the land may not be cleared regardless of what the landowners desire.

*Avoyelles III,* therefore, is clearly relevant to the accuracy of the Corps' assumption that the land in question will be cleared regardless of the Project. Despite this, the Corps did not undertake any re-evaluation of its assumption. Instead, it merely claimed that *Avoyelles III* was not the kind of new information that could warrant a supplemental EIS. Given the relevance of *Avoyelles III* to the question of whether the 17,300 acres will be cleared, the Corps' failure to consider the effect of that decision was unreasonable.

■ Finally, we consider what remedy is appropriate in light of the Corps' unreasonable action. We hold that while the Corps need not necessarily prepare a supplemental EIS, it must at least reconsider its assumption that the 17,300 acres will be cleared regardless of the Project. If the Corps is to adhere to this assumption, it must show that Section 404 permits will be granted to clear most or all of the 17,300 acres. If, on the other hand, the Corps determines that there is a reasonable possibility that a significant amount of land will not receive Section 404 permits, and that the Project may adversely affect this land, then the Corps must prepare a supplemental EIS to consider the effects of the Project on the uncleared land.[51] At this stage, we do not order a supplemental EIS because the question of whether the Project might have significant adverse impacts on the 17,300 acres is still an open one.[52] Thus far, the Corps has not analyzed this issue in light of *Avoyelles III.*

---

**49.** *Environmental Defense Fund v. Marsh, supra,* 651 F.2d at 992.

**50.** In our view, Judge Rubin's dissent loses sight of the hardwood forest through the trees. We think it self-evident that since *Avoyelles III* articulated new legal requirements governing the clearance of a large part of the project area, there is a reasonable likelihood that the Project may have significant, unconsidered effects. "The spirit of [NEPA] would die aborning if a facile, ex parte decision that the project ... did not significantly affect the environment were too well shielded from impartial review." *Save Our Ten Acres v. Kreger, supra,* 472 F.2d at 466.

**51.** We do not decide here exactly how many uncleared acres are "significant" and therefore warrant a supplemental EIS. This is a determination that the Corps should make in the first instance.

**52.** In this respect, the present case differs from *Environmental Defense Fund v. Marsh, supra,* where the court ordered the Corps to prepare "immediately" a supplemental EIS. 651 F.2d at 1006. In *Marsh,* unlike the present case, the plaintiffs offered "specific expert testimony and other evidence, unanswered by the defendants, to prove that all of the changes ... will have

In remanding to the Corps for further consideration, we reaffirm the principle that an EIS is more than a tissue of bare assumptions. If an assumption is to play a critical role in an EIS, it must, at the very least, be well-founded. The Corps cannot avoid the strictures of NEPA by simply assuming away potential problems.

AFFIRMED IN PART AND VACATED IN PART AND REMANDED.

ALVIN B. RUBIN, Circuit Judge, concurring in part and dissenting in part.

With respect for the views of my colleagues, I dissent from their decision to require the Corps "to perform an adequate analysis of whether a supplemental EIS is required," Part IIIB of the opinion. Like an EIS, a court's decision must be based on more than a tissue of assumptions. A court can neither avoid the basic principles of burden of proof nor become a factfinder by the alchemy of converting allegations into evidence. The record is devoid of evidence that would provide any support for the proposition that the Corps failed to take *Avoyelles III* into account when it prepared the EIS. More important, even if the Corps did not take *Avoyelles III* into account, the plaintiffs failed to adduce any evidence tending to show that, had the Corps done so, it should or likely would have reached a different result.

In all civil litigation, the burden of persuasion on each essential issue rests on the plaintiff.[1] The plaintiff must prove by a preponderance of the evidence that those facts essential to a decision in its favor are more likely to be true than not true. If the plaintiff fails to persuade the trier of fact, or if the plaintiff simply fails to adduce any evidence on an essential issue, the plaintiff has not carried its burden and must lose.

The same burden of proof rests on the plaintiff in environmental litigation. Recently, in *State of Louisiana v. Lee*,[2] we restated the principle that a plaintiff who challenges an agency's failure to prepare an *initial* EIS bears the burden of persuasion and clarified the standard that the plaintiff must meet.[3] Prior to our decision in *Lee*, the language of our decisions was neither consistent nor pellucid.[4] Now, however, it is clear that the plaintiffs must prove "that the Corps was unreasonable in concluding there was no reasonable possibility that the proposed action would significantly degrade any environmental factor."[5]

In an action challenging the adequacy of an EIS, therefore, the plaintiffs are required to *establish* that the EIS is inadequate. More than an allegation of deficiencies is necessary; the plaintiffs must prove the essential allegations of their complaint by a preponderance of the evidence.[6] The case law from other circuits employs, for the most part, the same analysis used in the Fifth Circuit.[7]

new environmental impacts that are quite significant, in either qualitative or quantitative terms." *Id.* at 996. In ordering different relief from *Marsh*, we follow the principle that "[t]he court should tailor its relief to fit each particular case." *Id.* at 1006.

1. F. James and G. Hazard, Civil Procedure § 7.6 (3d ed. 1985). *See* 9 Wigmore on Evidence § 2485 (Chadbourn rev. 1981).

2. 758 F.2d 1081 (5th Cir.1985).

3. *Id.* at 1084.

4. *See, e.g., Vieux Carre Property Owners, Residents & Associates, Inc. v. Pierce*, 719 F.2d 1272, 1279 (5th Cir.1983); *Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir.1978); *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 425 (5th Cir.1973); *Save Our Ten*

*Acres v. Kreger*, 472 F.2d 463, 466–67 (5th Cir. 1973).

5. *Lee, supra*, 758 F.2d at 1085 (emphasis added), citing *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir.1973).

6. *Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir.1975); *Sierra Club v. Lynn*, 502 F.2d 43, 52 (5th Cir.1974), *cert. denied*, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975); *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir.1974); *Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123, 1130–31 (5th Cir.1974).

7. Examples of cases discussing the process of proof in actions challenging an agency's decision not to prepare an initial EIS are *Lower Alloways Creek Township v. Public Service Elec.*

Similarly, a plaintiff who contends that a federal agency improperly failed to prepare a *supplemental* EIS bears the burden of proving that the changes that occurred after the EIS was prepared "will have a 'significant' impact upon the environment" that was not covered by the EIS.[8] In *Environmental Defense Fund v. Marsh,*[9] after stating this precept, we found that the plaintiffs had satisfied their burden of proof because they cited "specific expert testimony and other evidence, unanswered by the defendants, to prove that all of the changes ... will have new environmental impacts that are *quite significant,* in either qualitative or quantitative terms." [10]

The environmental organizations in this case did not adduce a single expert opinion or the testimony of a single witness that the impact of *Avoyelles III* would have been significant. The district court made no finding on the subject. All we know is that the Project involves 21,100 acres of bottomland hardwood forests, and that the Corps' survey of property owners, made before *Avoyelles III* was decided, found that 82%, or 17,300 acres, would be cleared even if the project were not undertaken. In fact, the plaintiffs conceded in oral argument that 8,000 to 9,000 acres have already been cleared. Based on these few facts, my brethren *find* that "the plaintiffs *raised* substantial environmental issues concerning approximately 40% of the forested areas within the project area." This "finding" is presumably based solely on the plaintiffs' mere allegations and mathematical computations made by deducting from the Corps' original figures the acreage admittedly already cleared. I doubt that, as an appellate court, we should make such findings of fact, and am certain that an allegation alone is not sufficient basis for us to do so.

My brethren assert that "[t]he Corps has never even claimed to have considered whether, under *Avoyelles III,* the land qualifies for clearance." Although literally accurate, this does not appear to me to fully state the Corps' position: in its brief, the Corps states that "[t]he District Engineer found, impliedly, that the *Avoyelles* decision did not result in new, previously unanalyzed, significant impacts on the environment from the project."

To debate whether or not the Corps has proved that a significant part of the Project area will be cleared even if the Project does not proceed, however, is beside the point. It is not the burden of the Corps to prove how much land will be cleared, nor does it bear the burden of establishing that the Project will not have significant environmental impact. It is the burden of the plaintiffs to adduce *evidence,* not merely to make allegations or to rest on assumptions, establishing that the Corps was unreasonable in reaching the conclusion it did and that there was in fact a reasonable possibility that the application of *Avoyelles III* would significantly change the conclusions reached in the EIS.

The Sicily Island Area Levee Project has been planned since 1975. The Corps submitted a draft EIS in 1978, which it revised and released in 1979. The EIS was completed and submitted in 1981. This suit began in 1983. It was tried in 1984. Now, in 1985, we in effect remand the question of the Project's environmental impact to the Corps. The Corps may conclude that a supplemental EIS should be prepared, or it may conclude that none is necessary, or it may decide to abandon or to modify the project. Any conclusion it reaches will be subject to further attack. This is not a

---

& Gas Co.,* 687 F.2d 732, 743, 747 (3d Cir.1982) and *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269, 271 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). Examples of opinions discussing the allocation of the burden of proof in suits opposing the adequacy of an initial EIS include *Monroe County Conservation Council, Inc. v. Adams,* 566 F.2d 419, 422 (2d Cir.1977), *cert. denied,* 435 U.S. 1006, 98

S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (8th Cir.1976).

**8.** *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 992 (5th Cir.1981).

**9.** 651 F.2d 983 (5th Cir.1981).

**10.** *Id.* at 996 (emphasis supplied).

course that should be taken unless the record demonstrates an evidentiary basis for such action. It is not warranted if it rests, as I submit it does, on the factual assumptions of an appellate court.

The effect of the course my brethren follow is likely, if pursued in other cases, to be disastrous. The Project has now been planned for ten years. The final EIS was submitted four years ago. New events are bound to occur in a four-year span. If every time an arguably "new", arguably "significant" event occurs, or an allegedly new and allegedly significant "fact" is discovered, those who oppose a project may, by filing suit, put the Corps to the burden of *proving* either that the datum has already been considered or that it is insignificant, no project could ever be completed if the opposition is determined.

Dedication to preservation of a wholesome environment neither requires nor permits us to depart from sound judicial precepts. The plaintiffs in this case have failed to show by evidence that the Corps has failed in its duty. They have not shown affirmatively that the Corps did not consider *Avoyelles III*. Moreover, the environmental organizations have not adduced any evidence that that decision would have a significant environmental impact on the Project. In short, the Corps' decision has not been shown to rest on a tissue of assumptions. I respectfully submit that it is the plaintiffs' case that mistakes words for facts and charges for evidence.

For these reasons, I respectfully dissent.