**CONNECTICUT TRUST FOR HISTORIC PRESERVATION, Appalachian Mountain Club, Sleeping Giant State Park Association, Connecticut Forest and Park Association, Rails to Trails Conservancy, and Protect, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents,**

**Atlantic Development Group, City of New Haven, Connecticut, National Trust for Historic Preservation, Boston & Maine Corp., Town of Cheshire, Connecticut, Town of Hamden, Connecticut, Intervenors.**

**No. 801, Docket 87–4123.**

United States Court of Appeals, Second Circuit.

Argued Jan. 28, 1988.

Decided March 9, 1988.

David A. Reif, New Haven, Conn., for intervenor Town of Hamden.

Charles H. Montange, Washington, D.C., for petitioners.

Evelyn G. Kitay, Interstate Commerce Com'n, Washington, D.C. (Robert S. Burk, General Counsel, Ellen D. Hanson, Associate General Counsel, Anne S. Almy, Asst. Chief, Appellate Section, Land & Natural Resources Div., Interstate Commerce Com'n, Washington, D.C., J. Carol Williams, Dept. of Justice, Washington, D.C., of counsel), for respondents.

Philip X. Murray, Boston, Mass., for intervenors Boston and Maine Corp. and Springfield Terminal Co.

Neil T. Proto, Stamford, Conn. (Martin S. Echter, Deputy Corp. Counsel, New Haven, Conn., Kelley Drye & Warren, Stamford, Conn., of counsel), for intervenor City of New Haven.

Cheever Tyler, Wiggin & Dana, New Haven, Conn., Donald G. Avery, Slover & Loftus, Washington, D.C., on the brief, for intervenor Atlantic Development Group.

David A. Doheny, Elizabeth S. Merritt, Paul W. Edmondson, Nat. Trust for Historic Preservation, Washington, D.C., Michael B. Gerrard, Judith M. LaBelle, David A. Hansell, Berle, Kass & Case, New York City, on the brief, for amicus curiae Nat. Trust for Historic Preservation.

Before VAN GRAAFEILAND, MESKILL and MAHONEY, Circuit Judges.

MESKILL, Circuit Judge:

This is a petition for review of a decision of Respondent Interstate Commerce Commission (ICC) granting permission for Intervenor Boston & Maine Corp. (B & M) to abandon approximately fourteen miles of the Farmington Canal branch rail line from its origin in New Haven, Connecticut to a point in Cheshire, Connecticut (Cheshire). Petitioner Connecticut Trust for Historic Preservation (Connecticut Trust) argues that the ICC failed to perform certain environmental and historical review functions in deciding to permit abandonment of the Canal Line. The history of the proceedings before the ICC, briefly summarized below, convinces us otherwise.

## BACKGROUND

B & M filed a Petition for Exemption on January 30, 1987, and notified the Connecticut Departments of Transportation and Public Utilities Control as well as the Connecticut Historical Commission. On February 23, 1987, the petition was refiled as a Notice of Exemption under the exempt abandonment procedure for out of service rail lines, 49 C.F.R. § 1152.50 (1986), promulgated pursuant to the ICC's exemption authority under 49 U.S.C. § 10505 (1982). In a decision served March 17, 1987, the ICC stated that the exemption would "be[come] effective" within thirty days of that date unless stayed pending reconsideration; it also noted that petitions for stay must be filed within ten days and petitions for reconsideration within twenty days. The Connecticut State Historic Preservation Officer (CSHPO) wrote to the ICC on March 26, 1987, to raise historical concerns implicated by the abandonment.

The ICC received timely requests for imposition of a Public Use Condition (PUC) pursuant to 49 U.S.C. § 10906 (1982) from the Connecticut Department of Environmental Protection (CDEP) and the Sierra Club; similar recommendations were received later from Cheshire and from Connecticut Trust. The exemption nevertheless became effective on April 16, 1987, before the ICC had undertaken any substantive evaluation of environmental or historic concerns. The Town of Hamden (Hamden) wrote to the ICC on April 23, 1987, that it had no interest in the portion of the line south of West Todd Street and that it considered that portion "inappropriate" for recreational use. The record discloses that a single parcel in Hamden was

later transferred to a private purchaser after Hamden and the State of Connecticut declined to purchase it, but the line remained otherwise intact although B & M apparently entered into several other agreements to transfer parcels in Hamden to private buyers. The ICC's Section on Energy and the Environment (SEE) prepared a detailed report on historical concerns, served June 15, 1987, which also requested a PUC.

The ICC's first major decision on the application, issued July 17, 1987 and served July 22, 1987, reopened the proceeding and granted a 180 day PUC—made retroactive, however, to April 16, 1987, the "effective" date of the prior Notice of Exemption. In the wake of that decision, several critical events occurred. The City of New Haven (New Haven) took steps to acquire the portion of the line within its limits for various non-recreational public purposes. CDEP acted to acquire the portion of the line north of West Todd Street in Hamden for recreational use. On July 29, 1987, SEE issued a finding of no significant environmental impact accompanied by an Environmental Assessment that identified environmental and historical effects of the proposed abandonment and proposed means to reduce or eliminate the minimal environmental effects of abandonment. On August 4, 1987, Connecticut Trust inquired into B & M's terms for sale of the line and later (apparently on September 11, 1987) filed with the ICC a statutory Notice of Willingness to assume responsibility for the abandoned line for recreational purposes.

Faced with an October expiration date for the PUC, the ICC issued an order on October 13, 1987 denying a petition for stay pending judicial review, but barring B & M from disposing of property "until our final decision on the merits becomes effective." That decision, issued November 25, 1987, dealt comprehensively with the historical and environmental consequences of the abandonment and concluded that it should go forward under conditions imposed to ameliorate those consequences. On December 9, 1987, the ICC delayed the effective date of its decision to December 17, 1987, and recalculated the PUC to run from July 22, 1987, the date of its first major decision in the case, and to expire on January 18, 1988. The ICC reasoned that April 16, 1987 could not be considered the "effective date" of the exemption because subsequent actions had the effect of revoking it. In addition, the ICC considered comments received December 9, 1987, from the Advisory Council on Historic Preservation (ACHP), the federal agency charged with implementing the National Historic Preservation Act, and extended the time in which ACHP might comment further on the action to sixty days from November 25. On December 31, 1987, ACHP made supplementary findings that ICC action had foreclosed its opportunity to comment on abandonment of the line *as a whole*, but had not affected its opportunity to comment on "known historic properties" affected by the abandonment.

As of now, CDEP appears to be proceeding with negotiations for State acquisition of the northern Hamden and Cheshire portion. New Haven will be acquiring the portion within its borders. The identified historic bridges will be sold to the State for minimal consideration. No offer has been received from any party for the whole Canal Branch as a unit, for rail, recreational or any other use. Hamden, apparently following a change in administration as a result of November elections, reversed its previously expressed lack of interest and now wishes to acquire the southern Hamden portion of the line for recreational use. The Trust for Public Land (TPL) wrote to the Rails to Trails Conservancy on January 22, 1988, that TPL was willing to attempt to arrange financing for this purchase. B & M is apparently going to negotiate with its non-public buyers in Hamden for easements to preserve a recreational trail to East Rock Park.

## DISCUSSION

Our review of the ICC's action is limited by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1982). We may overturn the ICC's decision only if it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; [or] ... short of statutory right." 5 U.S.C. § 706(2)(A), (C) (1982). Petitioners point to the ICC's obligations under provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1982), the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f (1982), and the National Trails System Act, 16 U.S.C. § 1247(d) (Supp. I 1983), as well as related regulations, and argue that the ICC failed to fulfill those obligations in the present proceeding.

Petitioners' contentions presume that the initial "final" authorization of abandonment on April 16, 1987, is the decision we review. It is not, and we do not decide the far different case that would have been presented had the ICC allowed that initial decision to stand without further consideration of environmental and historical factors. In the case before us, however, the ICC reopened the matter and gave thorough, albeit belated, attention to all the considerations these statutes require it to take into account. As a result, the final decision in this case was not issued until November 25, 1987, and subsequent events delayed the effective date of even that disposition until January 18, 1988. Thus the question presented here is whether the ICC acted on adequate information in discharge of its statutory obligations in issuing the decision of November 25.

The record before the ICC was assembled over a period of about seven months. In that time, the ICC received diverse comments about historical and environmental interests implicated by the proposed abandonment. By the time it issued its November 25 decision, the ICC had heard from the Connecticut Departments of Environmental Protection and Transportation as well as the CSHPO and all local governments affected by the action. In addition, numerous citizens and other groups including petitioners had offered comments.

Connecticut Trust's central argument is that it was deprived of an opportunity it should have had to purchase the entire line for trail use. But this argument is deeply flawed on the record before us. First, the alleged defects in procedure did not prevent the State or New Haven from acting promptly to acquire portions of the Canal Branch. Even assuming that the delay in imposing the PUC made it difficult to act before July 22, the prompt action of others thereafter renders suspect Connecticut Trust's claim that it suffered any prejudice. Second, it is revealing that neither Connecticut Trust nor any organization or individual with which it is allied has made any offer to acquire the Canal Branch for trail use. Connecticut Trust wrote on August 4, 1987, to inquire about B & M's terms for sale, but never responded to B & M's reply of September 8, 1987. The only gesture toward an offer came in TPL's letter of January 22, 1988, to the Rails to Trails Conservancy, and even that tardy letter said only that TPL was "optimistic" that it could arrange financing for the south Hamden part of the line "given an appropriate length of time of approximately six months." By this time, Connecticut Trust had known of the abandonment since at least June 4, 1987, the date it first filed comments with the ICC, and certainly had known of the PUC since it was imposed the following month. Connecticut Trust's protestations about the quality of its opportunity ring hollow in the face of its long inaction and the relative success enjoyed by others. *Cf. Natural Resources Defense Council, Inc. v. City of New York,* 672 F.2d 292, 299 (2d Cir.), *cert. dismissed,* 456 U.S. 920, 102 S.Ct. 1963, 72 L.Ed.2d 462 (1982).

■ Petitioners' argument that the National Trails System Act empowers the ICC to order trail use misses the mark. 16 U.S.C. § 1247(d) does not clearly confer such broad power and petitioners point to nothing that convinces us that the ICC's interpretation is an unreasonable or impermissible construction of the statute. We accordingly cannot disturb it. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Weeks v. Quinlan,* 838 F.2d 41, 43–44 (2d Cir.1988); *Niagara Frontier Tariff Bureau, Inc. v. United States,* 826 F.2d 1186, 1190–91 (2d Cir.1987); *Railway*

*Labor Executives' Ass'n v. United States,* 791 F.2d 994, 1002 (2d Cir.1986). *See also Washington State Dep't of Game v. ICC,* 829 F.2d 877, 881–82 (9th Cir.1987) (holding ICC's construction of section 1247(d) permissible and reasonable).

■ At oral argument, petitioner Connecticut Trust adverted to legislative history in support of its contention that 49 U.S.C. § 10906 similarly confers power on the ICC to require sale and impose terms for transfer of abandoned property for "public purposes." The ICC contends that its power under this section is more limited. We have found the legislative history of section 10906 instructive, although for reasons other than those urged by Connecticut Trust.

What is now section 10906 was originally enacted as section 809(c) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, 146 (1976) (4–R Act), and codified at former section 1a(10) of Title 49. In that form, the provision included language that Connecticut Trust claims both empowered and obliged the ICC to impose conditions and require sale for public purposes. Section 1a(10) was recodified as present section 10906 by the revised Interstate Commerce Act, Pub.L. No. 95–473, 92 Stat. 1337, 1406–07 (1978). Although the provision was rephrased at that time, the House Report made clear that "precautions [had been] taken against making substantive changes in the law." H.R.Rep. No. 95–1395, 95th Cong., 2nd Sess. 8, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009, 3017.

This history does not compel the conclusion Connecticut Trust urges us to reach. Section 10906 and its precursors do not unambiguously command the ICC to do anything other than impose "conditions" that "may include" a 180 day PUC. The ICC's view that it lacks power to require sale or impose terms and conditions of sale is accordingly a reasonable and permissible interpretation of section 10906 and we see no reason to disturb it. *See, e.g., Niagara Frontier Tariff Bureau,* 826 F.2d at 1190–91. In any event, the ICC can hardly be faulted for not imposing terms when it has imposed a PUC and when the B & M has been negotiating toward sale of large parts of the Canal Branch to New Haven. There is no need to force an agreement that is being worked out by consensus.

Our review of the legislative ancestry of section 10906 also reveals a significant aspect of the public use condition to which Connecticut Trust has not drawn our attention. The Senate Report on section 809(c) of the 4–R Act makes plain that sale for public purposes was intended to mean "acquisition of suitable properties *by public authorities* for alternative [non-rail] uses." S.Rep. No. 94–499, 94th Cong., 2nd Sess. 116, *reprinted in* 1976 U.S.Code Cong. & Ad.News 14, 131 (emphasis added). This legislative history suggests that private parties such as Connecticut Trust may not have been intended beneficiaries of section 10906 at all. In any event, it is clear enough that an opportunity to purchase was provided to all entitled to such an opportunity and public authorities took advantage of it.

■ The quality of the data before the ICC also has not been seriously challenged. Although petitioners impugn the historical information before the ICC and argue that a full Environmental Impact Statement (EIS) should have been prepared rather than a less elaborate Environmental Assessment (EA), they point to no specific defect that undermines the ICC's contrary conclusions. Regulations actually encourage preparation of an Environmental Assessment where possible. *See, e.g.,* 40 C.F. R. § 1507.3(b)(2) (1987) (agencies must identify classes of actions that normally require EA in lieu of full EIS); *id.* § 1500.4(p), (q) (agencies must identify actions that do not require full EIS); *id.* § 1500.5(k), (1) (same). More generally, the record suggests that the SEE reports on environmental and historical considerations were thorough and conscientious. They actually raised some possibilities that state agencies and towns later rejected, such as the options of treating the entire line as historically protectible and using it all as a recreational trail. NEPA and

NHPA require only that agencies acquire information before acting. *Cf. Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1983) (courts review agency decisions only to ensure adequate consideration and disclosure of environmental effects); *Harlem Valley Transportation Ass'n v. Stafford,* 500 F.2d 328, 336 (2d Cir.1974) (noting importance of completing environmental review before authorizing abandonment of rail line); *Jones v. District of Columbia Redevelopment Land Agency,* 499 F.2d 502, 511 (D.C.Cir.1974) (noting purpose of NEPA to ensure that agency decision making is informed by consideration of environmental factors), *cert. denied,* 423 U.S. 937, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975). This was clearly done here. Petitioners also fault the timing of this inquiry, but that is both analytically separable and, on this record, incorrect. Because we regard the November 25 decision as the "final" one for purposes of this analysis, we conclude that the ICC acted only after proper inquiry.

■ The ACHP's "finding" that the ICC foreclosed its opportunity to comment on the historical consequences of abandoning the line as a whole also is unfounded. The ACHP actually knew of the prospective abandonment as early as March 26, when the CSHPO sent ACHP a copy of her letter to the ICC. The ICC formally solicited ACHP comment on September 17, 1987. The ACHP's own regulations require it to respond within sixty days, *see* 36 C.F.R. § 800.6(b) (1987), well in advance of the ICC's November 25, 1987 final decision here. The ICC plainly afforded the ACHP the "reasonable opportunity to comment" required by 16 U.S.C. § 470f. The ACHP's failure to respond cannot be laid at the ICC's door.

Finally, we note that Hamden now asserts that, contrary to its earlier position, it is interested in acquiring the portion of the Canal Branch *south* of West Todd Street for recreational use. Nothing in the statutes or regulations obliges the ICC to rethink its decisions whenever an affected party changes its mind at a late stage in the process. Here, too, counsel admitted at argument that this change of heart was due at least in part to a change in administration in Hamden. This late development does not change our conclusion that the ICC satisfactorily discharged its responsibilities.

Considering the record as a whole, we conclude that the ICC's decision was amply supported and represents an informed and thoughtful balancing of environmental and historical concerns in the performance of its primary regulatory function. The conduct of the ICC, the public entities and B & M has evidenced serious concern with the mandates of NEPA, NHPA and the National Trails System Act. The end result of the process in this case has been a disposition of the abandoned line in a manner that apparently serves diverse public and private purposes. The ICC's performance of its multiple regulatory tasks here was ultimately sufficient in spite of the confusion manifested at various points in the process.

We have considered petitioners' other contentions and find them to be without merit. The petition for review is denied.